**DUREZ DIVISION OF OCCIDENTAL CHEMICAL CORP., Petitioner,**

**v.**

**OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, Respondent.**

**No. 89–1585.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 1990.

Decided June 19, 1990.

Peter L. de la Cruz, with whom Mark L. Itzkoff, Washington, D.C., was on the brief, for petitioner.

Charles F. James, Atty., Dept. of Labor, Washington, D.C., with whom Cynthia L. Attwood, Associate Sol., and Ann S. Rosenthal, Atty., Arlington, Va., Dept. of Labor, were on the brief, for respondent.

Before WALD, Chief Judge, MIKVA and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Durez Division of Occidental Chemical Corporation petitions to review the way in which the Occupational Safety and Health Review Administration has interpreted the disclosure requirements of its Hazard Communications Standard and applied them to the petitioners' phenol-formaldehyde compound known as "Durez 153." We agree with the Secretary's contention that the decision of this court in *General Carbon Co. v. OSHRC*, 860 F.2d 479 (D.C.Cir.1979) forecloses the petitioner's attempt to challenge the Commission's interpretation of the HCS. We are therefore constrained to deny the petition for review.

## I. BACKGROUND

Durez 153, a compound containing phenol and formaldehyde, is used by Durez's customers to make a variety of heat-resistent products, including pot and pan handles and distributor caps. When it is molded by a downstream product manufacturer, it releases small quantities of phenol vapor into the atmosphere.

A manufacturer of phenol is required by the HCS to disclose to purchasers all potential health risks associated with that chemical. *See* 29 C.F.R. § 1910.1000, Table Z–1 (reference list of air contaminants); *id.* § 1910.1200(d)(3)(i) (coverage of HCS). The HCS imposes upon chemical manufacturers and upon other employers who expose their employees to chemical products at the workplace a variety of requirements intended to ensure that employers and employees alike receive the information necessary to anticipate and to protect against potential chemical hazards. The Standard applies to "any chemical which is known to be present in the workplace in such a manner that employees may be exposed under normal conditions of use or in a foreseeable emergency." *Id.* § 1910.1200(b)(2). It defines as "hazardous" any chemical "for which there is statistically significant evidence based on at least one study conducted in accordance with established scientific principles that acute or chronic health effects may occur in exposed employees." *Id.* § 1200(c). Phenol is a regulated air contaminant, *id.* § 1910.1000, Table Z–1–A, and is therefore subject to the Hazard Communications Standard, *id.* § 1910.1200(d)(3)(i).

The HCS requires every manufacturer of chemicals to investigate the potential hazards of each chemical it either produces or uses in production; to label containers of hazardous chemicals; and to distribute to downstream users a Material Safety Data Sheet (MSDS) disclosing the health hazards posed by exposure to such chemicals. The HCS requires the MSDS to list

the health hazards of the hazardous chemical, including signs and symptoms of exposure, and any medical conditions which are generally recognized as being aggravated by exposure to the chemical. . . .

*Id.* § 1910.1200(g)(2)(iv). It further requires each downstream employer who uses these chemicals to instruct its employees, on the basis of the MSDS, in the appropriate methods for avoiding the hazards of exposure. *Id.* § 1910.1200(a)(2).

In 1988, OSHA inspected a chemical manufacturing facility operated by Durez, as a result of which the Secretary issued an "other-than-serious" citation alleging that the MSDS that Durez had prepared for Durez 153 violated the HCS. The MSDS disclosed the comparatively minor risks of irritation to the eyes, skin, and respiratory

tract, but failed to disclose that overexposure to phenol may cause damage to the liver, the kidneys, or the heart.

Although Durez did not deny that overexposure to phenol may cause damage to the liver, the kidneys, and the heart, it contested the citation before the Occupational Safety and Health Review Commission on the ground that the amount of phenol residue that the compound will release under foreseeable conditions of use in downstream worksites is too insignificant to pose a realistic threat of such damage. After a hearing, an ALJ concluded, based upon the classification of phenol as a hazardous chemical, the Preamble to the HCS, and the decision of this court in *General Carbon*, that Durez must disclose the potential for heart, liver, and kidney damage regardless of employees' foreseeable levels of exposure to Durez 153. No member of the Commission having called for review of this decision, it became the final order of the Commission, per 29 C.F.R. § 2200.90(d).

## II. Interpretation of the HCS

■ The Company places considerable weight upon the Secretary's own distinction between mixtures and chemicals in putting forward its claim that the HCS, properly interpreted, does not require the MSDS for Durez 153 to disclose all potential health risks associated with phenol. Mixtures are chemicals composed of constituents that have not reacted chemically with each other; mixtures are for that reason presumed to retain the hazardous properties of their constituents. *Id.* § 1200(c), (d)(5)(ii). Because phenol reacts and bonds with formaldehyde, leaving only small amounts of phenol residue that have failed to react with the formaldehyde, Durez asserts that Durez 153 is a chemical rather than a mixture. Under the HCS, Durez contends, the presence in a chemical of a residuum of hazardous material does not require a health hazard warning if a reliable study has shown—as Durez claims here to be the case—that employees at downstream worksites will not be exposed to concentrations above the permissible exposure limits (PEL) for that ingredient in

the conditions under which that chemical will foreseeably be used. In our view, however, this court's decision in *General Carbon* and the deference due the agency's reasonable interpretation of the HCS compel us to reject the claim that forms the core of the petitioner's argument.

■ *First.* In *General Carbon* we upheld a Commission order requiring a manufacturer to affix to containers of electrical brushes, which are mixtures, labels identifying the constituent chemicals and warning of all associated health risks. The brushes, made primarily of copper and graphite—both of which are hazardous chemicals for purposes of the HCS—emit small quantities of copper and graphite dust when they are handled by the employees of a downstream employer. This court considered and rejected the claim that the labeling requirements of the HCS, *id.* § 1910.1200(f)(1), do not apply where the foreseeable conditions under which such employees would handle the brushes would not expose them to concentrations in excess of the PELs for copper and graphite.

The court based its rejection of this argument upon the Preamble to the HCS, which provides that

> The hazard potential does not change even though the risk of experiencing health effects does vary with the degree of exposure.... The chemical manufacturer ... in making hazard determinations, should evaluate and communicate all the potential hazards associated with a chemical, whereas the [down-stream] employer may supplement this information by instructing employees on the specific nature and degree of hazard they are likely to encounter in their particular exposure situations.

48 Fed.Reg. 53,296 (1983). The import of this passage is clear: the likelihood, at a given level of exposure, of incurring any potential harm associated with a chemical ingredient is to be weighed and communicated by the downstream employer, rather than by the manufacturer of the chemical. The reason is equally obvious: the manufacturer of the chemical is less well positioned to foresee the full range of uses to

which its product may be put and the full range of exposure levels to which downstream employees may be subjected. While *General Carbon* addressed the scope of the labeling requirement rather than that of the disclosures required in a MSDS, our deference to the agency's judgment that a downstream employer is better able than the manufacturer of a chemical to adjust health warnings to the needs of its own workplace applies equally in the present context. Indeed, we reached our conclusion about the scope of the labeling requirement in part by reference to the scope of the disclosure required for a MSDS. *General Carbon*, 860 F.2d at 484–85.

Moreover, as we noted in *General Carbon*, "the MSDS is intended to set forth more detailed information than are the labels." *Id.* at 485. Therefore, having interpreted the HCS to require container labels to list all potential health risks associated with hazardous constituents, regardless of expected exposure levels, it would be anomalous for us now to hold that the disclosures required on the corresponding MSDS need not cover health risks that the manufacturer concludes will not materialize at projected levels of exposure, and we decline to do so.

■ *Second.* Quite apart from the force of *General Carbon* as precedent, we are obliged to defer to the Secretary's interpretation of her own regulation, if it is reasonable. *GAF Corp. v. OSHRC*, 561 F.2d 913, 915 (D.C.Cir.1977). Here, the Secretary reasonably found that the rationale for allowing a downstream employer to determine the actual risks posed by a hazardous chemical, in light of the uses to which the chemical will be put, applies equally to mixtures and to chemicals; and that the presence in a chemical of a hazardous residue that retains its chemical identity implicates the same policy considerations as the presence in a mixture of hazardous constituent materials. The Commission agreed, noting that "Durez 153 resembles a mixture in that residual phenol retains its chemical identity as it is released"; and the Secretary, in her brief, adds the observa-

tion that "the hazards of phenol due to exposure to Durez 153 in the workplace are in no way diminished simply because phenol emissions represent unreacted raw material." Accordingly, recognizing that hazardous residue in pure form is no less dangerous when contained in a chemical than when contained in a mixture, the Secretary would interpret the HCS as attributing to the compound the hazardous properties of its unreacted ingredients. We find nothing in the petitioner's argument to cast doubt upon the reasonableness of this interpretation.

We pause only to notice, for we need not today address, another potential anomaly. The HCS provides that "[i]f a mixture has not been tested as a whole to determine whether the mixture is a health hazard, the mixture shall be assumed to present the same health hazards as do the components which comprise one percent (by weight or volume) or greater of the mixture." 29 C.F.R. § 1910.1200(d)(5)(ii). Because the Standard provides no such threshold for chemicals other than mixtures, however, it appears that the manufacturer of a chemical that is the product of a reaction is required to disclose all potential health hazards posed by hazardous raw materials that retain their chemical identity in the reaction product, regardless of how small a percentage of that product the raw material may be. The reason for such seemingly disparate treatment is not apparent, but we are not called upon to evaluate its reasonableness today, because in fact phenol comprises more than 1 percent of Durez 153.

## III. VALIDITY OF THE HCS

■ The Company's alternative argument is that if the Secretary's interpretation of the disclosure requirement, as applied to the MSDS, is correct, then she exceeded her statutory authority in promulgating the HCS (in 1983). Section 6(b) of the Occupational Safety and Health Act, 29 U.S.C. §§ 655 *et seq.*, authorizes the Secretary to promulgate a standard prescribing "the use of . . . appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which

they are exposed...." Durez contends that requiring disclosure of all potential health hazards of a chemical, regardless of foreseeable exposure levels, is not necessary to ensure "that employees are apprised of all hazards to which they are exposed."

This argument, while not addressed in and therefore not foreclosed by *General Carbon,* is not properly before us because it was not effectively raised before the Commission in the Company's Petition for Discretionary Review of the ALJ's decision. The PDR does list, as one of five issues raised, whether "the Standard exceed[s] the statutory authority granted," but it nowhere discusses this issue, nor does it cite any authority or otherwise put the Commission on notice of the nature of or basis for its challenge. *See* 29 C.F.R. § 2200.91(d) ("a petition should concisely state the portions of the decision for which review is sought"). Because 29 U.S.C. § 660(a) provides that "[n]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect ... be excused by extraordinary circumstances," and because we find that the petitioner's abbreviated mention of its challenge to the validity of the Standard is "wholly inadequate to satisfy the requirement of § 660(a) that an objection be 'urged before the Commission,'" *Power Plant Div., Brown & Root, Inc. v. OSHRC,* 659 F.2d 1291, 1293 (5th Cir.1981), we conclude that the petitioner failed to preserve this challenge for judicial review.

### IV. MANUFACTURER'S TORT LAW DUTY TO WARN

 Finally, we reject the Company's claim that the Secretary's interpretation of the HCS disclosure requirement interferes with its duty, under state tort law, to warn employees of the health hazards posed by its products. Specifically, the petitioner contends that the Secretary's construction of the Standard forces it to bury the warnings that properly belong in the MSDS amidst a mass of "obscure" and "unnecessary" information. This is overly dramatic, however. The MSDS for Durez 153 con-

sists of four sparsely filled-in pages of a form, only a few entries on which would have to be elaborated to accommodate the risks to hearts, lungs, and kidneys. Realistically, therefore, OSHA's interpretation of the Standard does not force the manufacturer to choose between complying with the HCS and complying with the teachings of state tort law.

For these reasons, the petition for review is

*Denied.*