**IBP, Inc., Petitioner/Cross–Respondent,**

v.

**Alexis M. HERMAN, Secretary of Labor, and United States Department of Labor, Respondents/Cross–Petitioners.**

Nos. 97–1389, 97–1461.

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1998.

Decided June 2, 1998.

Charles M. Chadd argued the cause for petitioner/cross-respondent, with whom Jerome K. Bowman and John J. Vecchione were on the briefs.

Bruce Justh, Assistant Counsel for Appellate Litigation, United States Department of Labor, argued the cause for respondents/cross-petitioners, with whom Joseph M. Woodward, Associate Solicitor, and Ann S. Rosenthal, Counsel, were on the brief. Terri P. DeLeon, Counsel, entered an appearance.

Arthur G. Sapper argued the cause for amici curiae National Association of Manufacturers, et al., with whom Stephen C. Yohay was on the brief.

Before: EDWARDS, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

SILBERMAN, Circuit Judge:

IBP, Inc. petitions for review of the Occupational Safety and Health Review Commission's order holding it responsible for the failure of another employer's employees to comply with certain safety procedures. We grant the petition for review and vacate the Commission's order.

## I.

IBP, Inc. (the Company) operates a meat processing plant in Madison, Nebraska. In

1990, it hired DCS Sanitation Management, Inc., an independent contractor, to clean the plant's machinery after the close of production each day. To guard against the unintended activation of dangerous machinery, the Secretary of Labor has promulgated "lockout/tagout" (lockout) regulations under the Occupational Safety and Health Act. 29 C.F.R. § 1910.147 (1997). The regulations, *inter alia*, require employers to implement and enforce procedures by which employees cut machines off from their power sources before performing maintenance on them. DCS had its own lockout policy pursuant to those regulations, and was also bound by contract to comply with the Company's lockout policy. All of the Company's machines were capable of being locked out, and DCS employees were trained in the proper procedures.

Three Company employees, a product control manager and two inspectors, remained in the plant during the sanitation process. According to the contract, the Company could "tag" areas that did not meet its sanitation standards and DCS would have to reclean them. During the course of their quality control inspections, Company employees often saw DCS employees violating lockout procedures. One product control manager reported that "[o]n numerous occasions, I observed DCS employees ... reaching into tables [and] conveyors that were running, using fat augers as ladders to crawl up to the upper floors, riding on tables that were moving, [and] jumping across tables that were moving." Company employees often motioned to DCS employees to stop dangerous conduct, but DCS employees did not always take kindly to such suggestions. A Company employee testified that

> [o]ne time, when a DCS hourly was retrieving pieces of fat from the boneless loin paste table[,] I told him to stop what he was doing. He turned to me and said, "I don't work for you. You can't tell me what to do."
>
> . . . .
>
> ... Another time, I told a DCS hourly employee to stop what he was doing and he turned to me and said, "I don't have to." And the third time that comes vividly to my mind, a DCS hourly employee was using the fat auger at the east end of the

ham line complex as a ladder to get to the upper floor.

> I hollered at him to stop what he was doing. He continued up the auger, turned and shouted obscenities at me.

Company employees reported the lockout violations they observed to DCS supervisors and sometimes to Company supervisors as well. On one occasion, a DCS employee who was recleaning a tagged area stuck his hand into a moving belt after his supervisor turned his back. The Company quality control inspector told the DCS supervisor and later reported the incident to Company management. In response, the Company's Safety Director recommended that DCS review lockout procedures with its employees. Similarly, after one of the three occasions when a DCS employee actually caught his hand in a moving belt, the Company's Plant Manager sought assurance that DCS would follow the lockout program. But no Company employee ever tried to discipline DCS employees for violations. When DCS' operations manager was asked what oversight, if any, the Company had over lockout, the manager responded: "We're there to enforce [lockout as to] our own employees."

In 1993, a DCS employee was killed when he removed debris from a running loin saddle machine. The Secretary of Labor cited both the Company and DCS for willfully failing to enforce the lockout policy against DCS employees. Her claim against the Company was that it could have controlled whether DCS employees complied with lockout procedures, by suspending its contract with DCS if necessary. She stipulated to several key facts: that the hazard was the failure of DCS hourly employees to follow lockout procedures, that no Company employees created this hazard, that no Company employees were exposed to it, and that DCS operated as an independent contractor.

The ALJ vacated the citation against the Company, holding that

> [t]he sole indicia of control proven by the Secretary was IBP's right to rescind its contract with DCS based on DCS' safety violations. The Commission has never found an employer/employee relationship, for purposes of establishing liability under the Act[,] based solely on a contracting

entity's right to rescind its contract with an independent contractor. This judge believes it would be inappropriate to so extend liability under the Act.

*IBP, Inc.,* OSHRC Docket No. 93–3059 (Apr. 7, 1995). The Secretary sought review before the Occupational Safety and Health Review Commission, which reversed the ALJ and reinstated the citations. *IBP, Inc.,* 17 O.S.H. Cas. (BNA) 2073 (1997). In its decision, the Commission emphasized that no employer/employee relationship is necessary to establish liability under the Occupational Safety and Health Act. Under the Commission's "multi-employer doctrine," an employer may be liable for hazards under its control even if none of its own employees is exposed to the danger. The Commission, like the Secretary, thought that the Company's right to cancel its contract with DCS gave it control over the hazard.[1] It thus held the Company liable, but it did refuse to find the violation willful.

Commissioner Montoya vigorously dissented, arguing that the majority's decision "created a form of contractual indemnity that significantly expands the Commission's case law on multi-employer liability." *Id.* at 2077 (dissenting opinion). In her view, the Company's authority to cancel the DCS contract could not establish "control" in any realistic sense of the term. Prior Commission decisions had spoken of control primarily in the context of the employer's ability to abate physical hazards like defective machinery. She thought the majority's reach to the Company particularly inexplicable since DCS had been found liable in a separate proceeding and was under a judicially enforceable order to enforce the lockout policy at the Madison plant. *DCS Sanitation Management, Inc. v. OSHRC,* 82 F.3d 812 (8th Cir.1996).

## II.

Petitioner argues that it cannot be held responsible for DCS' employees. According to the Company, OSHA duties are confined to the employment relationship and the multi-employer doctrine exceeds the Secretary's authority under both the Occupational Safety and Health Act and its own regulations. But even if the multi-employer doctrine is legitimate, the Company contends that the Commission erred in this case by concluding that the Company's authority to cancel the DCS contract gave it "control" over the behavior of DCS employees. The Secretary, on the other hand, asks us not only to deny the petition, but also to reverse the Commission's conclusion that the Company did not act willfully. She defends the multi-employer doctrine by asserting that both the Act and implementing regulations are ambiguous and that we must defer to her interpretation permitting liability outside the employment relationship. Although she does not elaborate much on the point, she also insists that the Company had control of lockout enforcement.

Both parties, as well as *amici curiae,* devote considerable effort to debating the legitimacy of the Secretary's multi-employer doctrine. The doctrine had its inception in the construction industry, where numerous contractors and subcontractors mingle throughout a single work site. Craft jurisdictional rules typically prevent specialists of one craft from performing work in another craft—so a plumber, for example, cannot remove exposed wiring even if his own employees must step over it to lay pipe. To address this problem, the Secretary of Labor began bringing enforcement actions against the employer responsible for a particular hazard, regardless of whether the employer's own employees were exposed to the danger. The Secretary's theoretical justification for this approach was based on her reading of 29 U.S.C. § 654(a) (1994), which sets out two obligations for employers:

Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this chapter.

---

**1.** In finding control, the Commission relied on the Company's ownership of the plant as well as its authority under the contract. The Secretary does not defend the Commission's decision on the property ground—which is understandable, since the Company's ownership of the property does not add anything to its contractual rights.

The Secretary has repeatedly argued that subsection (a)(1) creates a general duty running only to an employer's own employees, while (a)(2) creates a specific duty to comply with standards for the good of *all* employees on a common work site—the employer's own as well as anyone else's—that could be endangered by a violation. *See Anthony Crane Rental v. Reich*, 70 F.3d 1298, 1305–06 (D.C.Cir.1995). But, as the Company and *amici* point out in this case, the Act defines the term "occupational safety and health standard" as one "reasonably necessary or appropriate to provide safe or healthful *employment* and places of *employment*." 29 U.S.C. § 652(8) (1994) (emphasis added). And it defines "employer" as "a person engaged in a business affecting commerce *who has employees*." 29 U.S.C. § 652(5) (1994) (emphasis added). The Secretary's view has always been that because of the Act's broad "remedial" purpose, these references to the employment relationship were not intended to be restrictive or interpreted in the common law sense. *But cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–25, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (rejecting the argument that the word "employee" in a statute should be interpreted with an eye to the mischief to be corrected in favor of the "well-established principle" that Congress is presumed to use "employee" in the common-law, master-servant sense). Yet she does not take her interpretation to its next logical step and argue that anyone who happens to appear on a work site is covered so long as he is an employee of someone. She interprets her own regulations, which say that "[i]n the event a standard protects on its face a class of persons larger than employees, the standard shall be applicable under this part only

to employees and their employment and places of employment," 29 C.F.R. § 1910.5(d) (1997), as distinguishing between workers on the job and mere passers-by.

The Company and *amici* object to any form of the multi-employer doctrine, but they particularly object to it outside the construction context, where they say there are no craft jurisdictional rules to justify it. The Commission has sanctioned non-construction multi-employer liability in only one other instance. *Harvey Workover, Inc.*, 7 O.S.H. Cas. (BNA) 1687 (1979).[2] There, the cited employer was engaged in offshore drilling and hired a welder to repair a damaged water jet line on its barge. Harvey Workover failed to check the atmosphere inside a sealed compartment on the barge, and the welder, as well as three of Harvey Workover's own employees, fell unconscious from oxygen deficiency after entering it. Finding Harvey Workover liable, the Commission said: "We no longer find the distinction between construction sites and other worksites valid. The safety of all employees can best be achieved if each employer at multi-employer worksites has the duties to (1) abate hazardous conditions under its control and (2) prevent its employees from creating hazards." *Id.* at 1689. Thus, although that case could have been decided on the basis of Harvey Workover's duty to its own employees who entered the sealed compartment, it instead significantly extended the multi-employer principle. Since the lockout violations in the Company's case took place in a non-construction setting, the Commission relied on *Harvey Workover* to hold the Company liable.

We see tension between the Secretary's multi-employer theory and the language of the statute and regulations, and we have expressed doubt about its validity before.[3]

2. Although the Secretary describes non-construction multi-employer liability as well-established, the cases that she cites to support this proposition are not on point. *See Red Lobster Inns of Am., Inc.* 8 O.S.H. Cas. (BNA) 1762 (1980) (although the employer was not in the construction industry, the violation occurred on a construction site); *Rockwell Int'l Corp.*, 17 O.S.H. Cas. (BNA) 1801 (1996) (addressing multi-employer defense available under § 654(a)(1) rather than multi-employer liability under § 654(a)(2)).

3. The doctrine has somewhat of a checkered history. The first time the Secretary cited an employer for exposing only another employer's employees to danger, the Commission rejected the citation as beyond his authority under the Act. *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255 (4th Cir.1974). There, the Secretary tried to hold a general contractor responsible when two employees of its subcontractor were killed in a scaffolding collapse. The Commission vacated the citation because the general contractor was not the "employer" of the deceased employees. On review, the Fourth Circuit reached the same

*Anthony Crane Rental,* 70 F.3d at 1306–07. But it is once again unnecessary to decide that issue, because even under the expansive *Harvey Workover* rule, the Secretary has to establish petitioner's control—and we agree essentially with Commissioner Montoya that the Secretary did not make that showing.

▮▮▮▮▮ Both the Company and the Secretary frame our review of this issue as a "substantial evidence" question, surely because the Occupational Safety and Health Act's judicial review provision provides that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 29 U.S.C. § 660(a) (1994). This provision, however, neither restricts our review to questions of fact nor precludes arbitrary and capricious review of Commission decisions. While that section governs factfinding, Congress did not intend to relieve the Commission of the reasoned decisionmaking requirement of the Administrative Procedure Act. *S.G. Loewendick & Sons, Inc. v. Reich,* 70 F.3d 1291, 1294 (D.C.Cir.1995); *see also* 5 U.S.C. § 706(2)(A) (1994). And whether it is legitimate for the Commission to conclude that the Company's ability to cancel the contract gives it "control" over the hazard is more naturally and appropriately tested in terms of reasonableness than in terms of evidentiary weight. *See Bangor Hydro–Electric Co. v. FERC,* 78 F.3d 659, 663 n. 3 (D.C.Cir. 1996). Of course, using reasonableness as the analytic framework is a matter of conceptual ease rather than substantive difference, for the substantial evidence standard is no more than a specific application of arbitrary and capricious review. *Association of Data Processing Serv. Orgs. v. Board of Governors of the Fed. Reserve Sys.,* 745 F.2d 677, 681–86 (D.C.Cir.1984). To be sure, we have said that the statute's use of substantial evidence as the standard of review for informal rulemaking (which does not have a testimonial record) is so anomalous that Congress must have intended a somewhat more searching review than we would perform under the normal APA arbitrary and capricious standard. *AFL–CIO v. Marshall,* 617 F.2d 636, 648–52 (D.C.Cir.1979); *Industrial Union Dep't v. Hodgson,* 499 F.2d 467, 472–76 (D.C.Cir.1974); *see also AFL–CIO v. OSHA,* 965 F.2d 962, 970 (11th Cir.1992). But we have never given that OSHA judicial review standard any special significance in an adjudication. *See Loewendick & Sons,* 70 F.3d at 1294; *Anthony Crane Rental,* 70 F.3d at 1302.

▮▮▮ The clause at issue in the DCS contract provided:

> IBP may terminate this Agreement without penally [sic] upon not less than one week's notice to Contractor if Contractor violates IBP's Contractor Safety Policy (a copy of which is attached to this Agreement), or if Contractor is cited for a repeat violation by OSHA or the State equivalent

result on regulatory grounds. Focusing on 29 C.F.R. § 1910.5, the court held that the word "employees" was ambiguous and the Commission's interpretation reasonable. (Insofar as the court deferred to the Commission's interpretation of the regulation rather than the Secretary's, its opinion has been overruled by *Martin v. OSHRC,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).) The Second Circuit was far more receptive to the Secretary's theory. In *Brennan v. OSHRC,* 513 F.2d 1032 (2d Cir.1975), the Secretary cited a subcontractor for failing to install perimeter guards and allowing material stored on upper floors to hang over the edge. The Commission refused to sanction the liability because none of the subcontractor's own employees was exposed to the danger. The court, vacating the order, appeared to hold not only that multi-employer liability was permissible, but that the Act actually *required* it. *Id.* at 1038. After *Brennan v. OSHRC,* the Commission changed its position and began endorsing the Secretary's ef-

forts to impose multi-employer liability. Most circuits have accepted multi-employer liability, at least in the construction context. *See Teal v. E.I. DuPont de Nemours & Co.,* 728 F.2d 799 (6th Cir.1984); *Beatty Equip. Leasing, Inc. v. Secretary of Labor,* 577 F.2d 534 (9th Cir.1978); *Marshall v. Knutson Constr. Co.,* 566 F.2d 596 (8th Cir.1977). The Seventh Circuit has implicitly accepted multi-employer liability under § 654(a)(2), but has also held that a "multi-employer defense" exists under § 654(a)(1). Thus the employer is not liable under the general duty clause when its own employees are exposed to hazards beyond its reasonable control. *Anning–Johnson Co. v. OSHRC,* 516 F.2d 1081 (7th Cir.1975). Only the Fifth Circuit has squarely rejected multi-employer liability, holding that the § 654(a)(2) duty to comply with OSHA standards runs from an employer only to his own employees. *Melerine v. Avondale Shipyards, Inc.,* 659 F.2d 706 (5th Cir.1981).

agency, or if Contractor's operations result in a death or amputation injury.

The Commission thought this provision important because the Company could have used it to pressure DCS to enforce lockout precautions. Thus the Commission's theory is something like "control, once removed." The root hazard is, as the Secretary stipulated before the ALJ, "the failure of DCS employees to follow lockout/tagout," with the secondary, implicit hazard being "DCS' failure to supervise its own employees."

In her brief and at oral argument, the Secretary has simply stated in a conclusory way that substantial evidence supports the finding of control. But the problem is not that the evidence did not add up to "control," it is that the Commission has redefined control in an irrational way to meet the evidence. To reason that petitioner's general control over DCS, because of its ability to terminate the contract, subsumes the power to discipline individual DCS employees is to take the meaning of "control" to an unacceptably high level of abstraction. The Company pointed out the safety violations to DCS supervisors and management, which is the most it could be expected to do. *Cf. Red Lobster Inns of Am., Inc.,* 8 O.S.H. Cas. (BNA) 1762 (1980) (holding employer with "general supervisory authority" over a work site liable for failing to correct a hazard, but this employer also did not even warn subcontractors of the danger). To require it to cancel its contract with DCS, potentially bringing plant operations to a halt, is to employ a howitzer to hit a small target. It is unclear what the Secretary hoped to accomplish by her approach, since, as Commissioner Montoya emphasized, DCS, the employer who could easily control its own employees' disciplinary infractions, had already been held liable for the same violation. The majority's decision, moreover, seems to reduce general contractors' incentive to advance workplace safety—rather than cracking down on safety through contract termination, they would respond to it simply by eliminating any reference to safety in subcontracts.

■ Nor is there substantial evidence—under a normal understanding of "control"—to support the proposition that the Company otherwise assumed the authority to enforce the lockout program against DCS employees.

The Secretary notes that the Company reserved the right, in its "sole discretion," to rescind any DCS employee's "IBP employee ID card," an action that would effectively bar that employee from the Madison plant. But this clause does not suggest that the Company reserved the right to discipline DCS employees. It could just as easily mean—and likely did—that the Company wanted the authority to bar DCS employees when it thought that they posed a threat to the Company's own employees or facility. Moreover, the other provisions in the contract cut against the Secretary's position. It stated that the "Contractor shall furnish *the sole supervision and control* of such labor as is necessary to perform this Agreement." (Emphasis added.) It also required DCS to assume the responsibility for complying with OSHA standards and the Company's own lockout policy. Indeed, the contract reflects the Company's disavowal of micromanagement.

■ The Company's lockout policy, which required the Company's managerial employees to enforce compliance "by all personnel (management, hourly, and contractor)," using disciplinary action where warranted, gives slightly more support to the Commission's conclusion. But, when compared with the testimony of the Company and DCS employees, it is hardly "substantial." Witnesses from both the Company and DCS explained that they thought DCS retained sole disciplinary authority. A Company safety director said that, under the lockout policy, the Company could discipline "DCS the company"—by contract suspension—but had no authority over DCS employees. The Secretary herself stipulated that Company personnel believed they had no authority to suspend DCS employees from work. DCS management employees operated under the same understanding, testifying that they were there to enforce safety rules as to their own employees and that it was their responsibility to correct safety problems. Moreover, the Company did not assume responsibility for safety control by sending three employees to perform quality control during the sanitation process. Any doubts about the Company's *de facto* relationship with DCS are clarified by the way DCS employees rudely rebuffed

the Company's attempts to warn them—responses like "you can't tell me what to do" hardly suggest that anyone perceived the Company as the one in control.

Finally, the Secretary tries to find support in the language of a 1991 settlement agreement she entered with the Company. Before the Company hired DCS to work at its plant, it received an OSHA citation for a Company employee's failure to lock out the same loin saddle machine at issue in this case. The Company and the Secretary settled the citation, and a provision of the agreement required the Company to "instruct employees working on the loin saddle table that product may not be retrieved from under said table except pursuant to the lockout policy." Even assuming this clause is applicable here, the Company satisfied it by providing DCS with a copy of its lockout policy, notifying DCS supervisors when it observed violations, and meeting with DCS management about the importance of lockout safety. The agreement requires no more.

\* \* \*

The Company's petition for review is granted, the Commission's order vacated, and the citation dismissed.