**A.J. McNULTY & COMPANY,
INC., Petitioner,**

v.

**SECRETARY OF LABOR, Respondent.**

No. 00–1508.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 2002.
Decided March 19, 2002.

Arthur G. Sapper argued the cause and filed the briefs for petitioner.

Ronald J. Gottlieb, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief were Joseph M. Woodward, Associate Solicitor, and Ann S. Rosenthal, Counsel. Charles F. James, Attorney, entered an appearance.

Before: GINSBURG, Chief Judge, RANDOLPH and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Petitioner, a construction company, challenges the Occupational Safety and Health Review Commission's affirmance of a series of OSHA citations based on the company's failure to comply with workplace safety regulations. Petitioner also challenges the Commission's classification of several violations as "willful." To the extent petitioner has preserved its challenges for review, it has failed to demonstrate that the Commission erred legally or that its decision lacks substantial evidentiary support. The Commission's classification of some citations as willful presents a closer question, but because this determination is also supported by substantial evidence, we reject those challenges as well.

I.

The Occupational Safety and Health Act imposes a general duty on employers to keep workplaces "free from recognized hazards that are ... likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). Authorized by that Act to promulgate and enforce workplace-safety regulations, see id. § 655(b), the Secretary of Labor delegated most of her authority to the Occupational Safety and Health Administration (OSHA), see 65 Fed.Reg. 50,-017 (2000). OSHA compliance officers regularly inspect workplaces. If they identify a violation of safety regulations, OSHA issues a citation in one of three categories: "not serious," for which a fine of up to $7000 "may be assessed"; "serious," for which a fine of up to $7000 "shall be assessed"; and "willful," for which a fine of at least $5000 but not more than $70,000 "may" be assessed. 29 U.S.C. § 666(a)–(c). Employers may challenge citations, in which case an administrative law judge conducts a hearing and issues a decision. Id. § 661(j); 29 C.F.R. § 2200.90(a) (2001). Employers may appeal adverse ALJ decisions to the Occupational Safety and Health Review Commission. Id. §§ 2200.91–.92.

Petitioner A.J. McNulty & Co. specializes in "precast concrete construction," in

which huge, precast concrete slabs are assembled to create walls, ceilings, and floors. Because the concrete sections, known in the industry as "double-T's," weigh as much as forty tons and rise as high as three stories, cranes are needed to lower them into place. As the crane operator, who sometimes can see neither the double-T nor its intended location, lowers the double-T into its approximate position, McNulty employees use ropes to guide the slab into its precise place. This process is dangerous, occasionally requiring workers to move quickly to avoid an errant double-T. Once a double-T has been properly positioned, McNulty employees secure it by welding together steel plates embedded in each piece.

In 1993, construction project manager Whiting–Turner Contracting Co. began work on a ten-deck parking garage in White Plains, New York. The company Whiting–Turner hired to perform the concrete construction in turn subcontracted with McNulty to install the double-T's. Shortly after work commenced, Whiting–Turner issued written safety notices to McNulty complaining about the company's failure to protect employee safety. These notices, which Whiting–Turner issues only if informal verbal notices have been ignored, called attention to, among other things, McNulty's failure to erect guardrails to protect workers from falling off edges of recently-installed floor pieces. Representatives of the two companies met to discuss the problem, but Whiting–Turner once again issued written safety notices to McNulty for continuing to expose employees to unsafe conditions. After OSHA compliance officers surveyed the project, the Agency cited McNulty for numerous willful violations of workplace safety regulations that require construction companies to use guardrails or safety nets to protect workers from dangerous falls. *See generally* 29 C.F.R. § 1926.105, *id.* § 1926.500 (1994).

McNulty contested the citations. Following a hearing in which an ALJ upheld the citations in all respects, McNulty sought review before the Commission. The Commission affirmed the ALJ's findings, but reduced the classification of some citations from "willful" to "serious."

McNulty appeals ten citations. The issues presented are both numerous and complex, and McNulty's counsel did not help matters by submitting a confusingly organized brief that contained a completely uninformative statement of issues. *See* FED. R. APPELLATE P. 28(a)(5) (requiring a statement of issues). Prior to oral argument, we directed McNulty to submit a revised statement of issues, warning that we would decline to consider the merits of any "issue not specifically listed." Order of the U.S. Court of Appeals for the D.C. Circuit at 1, *A.J. McNulty & Co. v. Sec'y of Labor* (Jan. 3, 2002) (No. 00–1508). Working from the company's revised statement of issues and following the sensible organization of the Secretary's brief, we consider the challenged citations in three categories: (1) failure to construct guardrails around "floor openings" and "open-sided floors"; (2) failure to construct guardrails on narrow, elevated platforms; and (3) failure to tie off adequately or otherwise secure workers using a steel cage called a "man-basket."

## II.

Familiar principles of administrative law govern our review of the Commission's fact-finding and its application of law to facts. Commission findings of fact stand if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a); *see also IBP, Inc. v. Herman,* 144 F.3d 861, 866 (D.C.Cir.1998). Its legal determinations stand unless they are "arbitrary, capricious, . . . or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A); *see also Loewendick & Sons, Inc. v. Reich,* 70 F.3d 1291, 1294 (D.C.Cir.1995). We owe "substantial deference to an agency's interpretation of its own regulations," which has "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotation marks and citations omitted). In OSHA cases, there are two administrative actors: the Secretary and the Commission. In *Martin v. Occupational Safety & Health Review Commission,* the Supreme Court explained that because the Secretary, not the Commission, has authority to make enforcement decisions and to render definitive interpretations of OSHA regulations, courts owe "substantial deference" only to the Secretary's interpretation. 499 U.S. 144, 151–57, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). We treat Commission interpretations as "equivalent to [those made by] a 'nonpolicymaking' district court." *Molineaux v. United States,* 12 F.3d 264, 267 (D.C.Cir.1994) (quoting *Martin,* 499 U.S. at 154, 111 S.Ct. 1171).

With these standards in mind, we consider the three categories of citations.

### Floor Openings and Open–Sided Floors

OSHA issued these citations pursuant to two regulations. The first requires that "[f]loor openings shall be guarded by a standard railing ... on all exposed sides." 29 C.F.R. § 1926.500(b)(1) (1994). OSHA cited McNulty for violating this provision after compliance officers observed two instances in which the company failed to install guardrails along the open edges surrounding the spaces where double-T floor members remained to be installed on levels P–2 and P–5 of the parking structure.

■ McNulty argues that the guardrail regulation is inapplicable because at the time of the citation, the surfaces in question were not "floors" within the meaning of that regulation. Before addressing this contention, we must consider whether, because McNulty raised this issue only in its brief before the Commission and not in its petition for discretionary review (known as a PDR), we lack jurisdiction under 29 U.S.C. section 660(a): "No objection that has not been urged before the Commission shall be considered by the court [of appeals]." *See also Power Plant Div., Brown & Root, Inc. v. Occupational Safety & Health Review Comm'n,* 659 F.2d 1291, 1293 & n. 3 (5th Cir. Unit B 1981) ("We have previously characterized [29 U.S.C. § 660(a) ] as a limit upon our jurisdiction."), *modified and aff'd. on reh'g,* 673 F.2d 111 (5th Cir. Unit B 1982); *Athens Community Hosp. v. Schweiker,* 686 F.2d 989, 992 (D.C.Cir.1982) (courts may raise jurisdictional issues sua sponte).

Resolving this issue requires an understanding of the Commission's appeal procedures as well as of section 660(a). An employer wishing to challenge an ALJ decision begins the appeal process by filing a PDR with the Commission. 29 C.F.R. § 2200.91(b). The Commission may review any issue raised in the PDR or, on its own motion, any other issue. *See id.* If the Commission directs review, it ordinarily requests briefs, hears oral argument (if it chooses), and then issues a final order disposing of the matter. *See id.* §§ 2200.93, 2200.95. If the Commission fails to direct review of an issue within thirty days of the PDR's filing, the ALJ report becomes the Commission's final order. *See id.* § 2200.90(d). Either way, the Commission's final order is reviewable in the appropriate court of appeals, subject to the limitation that courts of appeals lack jurisdiction over "objection[s] ... not ... urged before the Commission." 29 U.S.C. § 660(a).

According to McNulty, the phrase "urged before the Commission" is broad enough to include raising an objection for the first time in a Commission brief. In cases where the Commission declines to review the ALJ decision, we and our sister circuits have uniformly held that courts of appeals lack jurisdiction over objections not raised in the PDR. *See Durez Div. of Occidental Chem. Corp. v. Occupational Safety & Health Admin.*, 906 F.2d 1, 5 (D.C.Cir.1990); *see also, e.g., P. Gioioso & Sons v. Occupational Safety & Health Review Comm'n*, 115 F.3d 100, 107 (1st Cir.1997) (same). We know of only one case that sheds light on the precise issue here: What happens when the Commission agrees to review an ALJ decision, and the employer, having failed to present an objection in its PDR, does so in its Commission brief? In *Trinity Industries v. Occupational Safety & Health Review Commission*, 206 F.3d 539, 542 (5th Cir. 2000), the Fifth Circuit held that an employer's failure to present an essential objection in its PDR did not preclude judicial review where the employer clearly raised that objection in its Commission brief. According to the Fifth Circuit, requiring the employer also to have raised the objection in its PDR would "place form above purpose." *Id.* at 542.

In our view, the result reached by the Fifth Circuit is equally appropriate in this case. To begin with, nothing in the phrase "urged before the Commission" suggests that an employer must raise every objection in its PDR; to the contrary, an employer that presents an objection in its brief has, by any understanding of the word, "urged" it before the Commission. Indeed, when Congress wants to limit judicial review to objections raised at a particular stage of the administrative process, it does so expressly. For example, the Federal Power Act provides that "[n]o objection to the order of the [Federal Energy Regulatory] Commission shall be considered by the court ... [unless] urged before the Commission *in the application for rehearing.*" 16 U.S.C. § 825*l*(b) (emphasis added); *see also Platte River Whooping Crane v. Fed. Energy Regulatory Comm'n*, 876 F.2d 109, 113 (D.C.Cir. 1989) (interpreting this language to require that petitioners seeking review of a FERC order must first "petition for rehearing of those orders and must *themselves* raise in that petition *all* of the objections urged on appeal" and emphasizing that "[n]either FERC nor this court has authority to waive these statutory requirements"). Permitting judicial review of objections raised for the first time in Commission briefs, moreover, preserves the role Congress intended the Commission to play in the OSHA review process. Section 660(a)'s review-limiting clause ensures that the Commission has a fair chance to consider objections to ALJ decisions prior to judicial review. *See Power Plant Div., Brown & Root*, 659 F.2d at 1293–94 (interpreting 29 U.S.C. section 660(a) to require only that "the Commission be alerted to the issues and have the opportunity to pass on them before a court begins its review of the administrative process") (internal quotation marks and citations omitted); *cf. also United States v. L.A. Tucker Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has an opportunity for correction in order to raise issues reviewable by the courts."). Presenting objections in Commission briefs achieves this end. To preclude judicial review where McNulty has "put the Commission on notice of the nature or basis for its challenge," *Durez*, 906 F.2d at 5, simply because the company failed to include the objection in its PDR would, indeed, "place form above purpose," *Trinity Indus.*, 206 F.3d at 542.

■ While McNulty has successfully preserved its claim that the surfaces in question were not "floors" within the meaning of the regulation, the argument lacks merit. Nothing in the regulation suggests that the term "floors" applies only to complete floors. On the contrary, the regulation expressly "appl[ies] to temporary ... conditions where there is danger of employees or materials falling through floor ... openings," 29 C.F.R. § 1926.500(a) (1994), suggesting that it applies with particular force to incomplete floors where yet-to-be-installed double-T's create additional fall hazards. The ALJ decision on which McNulty primarily relies, *Spancrete Northeast, Inc.,* stands for the unremarkable and irrelevant proposition that floors are incomplete until all double-T's are secured. 1981 WL 19242, *3 (ALJ Feb. 18, 1981) ("In precast concrete construction, a 'floor' within the meaning of [the regulation] is only complete when all the double T's constituting a level are secured.").

McNulty's related argument—that the ALJ erred by excluding certain testimony about industry understanding of the term "floor"—is waived. The company's only reference to this argument appears in the section of its Commission brief discussing willfulness. McNulty thus failed to give the Commission notice that its objections to the ALJ's evidentiary rulings related to the company's arguments about the meaning of the term "floor."

■ McNulty next challenges the Commission's rejection of the company's "infeasibility defense" to its failure to erect guardrails around floor openings. Although "[i]t is an affirmative defense to a charge of violating an OSHA standard that compliance was impossible or infeasible," *Bancker Constr. Corp. v. Reich,* 31 F.3d 32, 34 (2d Cir.1994), an employer mounting such a defense must show not only the infeasibility of compliance, but also that it

either used alternative means of protection or that such means were infeasible. In this case, we need not consider McNulty's many arguments that compliance with the regulation was technically infeasible, for the record contains substantial, undisputed evidence supporting the Commission's conclusion that the company could have installed alternative means of fall protection. OSHA's compliance officer testified that "McNulty could have put free-standing ... guardrails back from the edge where they would not have interfered with installing the floor piece." *A.J. McNulty & Co.,* 19 O.S.H. Cas. (BNA) 1121, 1130 (O.S.H.R.C. 2000). Although McNulty claims that *bolted-stanchion* guardrails would have interfered with installation of precast concrete members, it never disputed, either before the Commission or this Court, the compliance officer's testimony that *free-standing* guardrails were feasible. McNulty also contends that the Commission erred by imposing on it the burden of proving the infeasibility of alternative methods of fall protection. Not only is this claim directly contrary to law, *see Bancker Constr.,* 31 F.3d at 34; *cf.* 29 C.F.R. § 1926.501(b)(2)(i) (2001) (placing burden on employer to demonstrate infeasibility), but it too is waived, appearing in neither the company's PDR nor Commission brief.

Equally unpersuasive is McNulty's argument that the Commission erred by rejecting its "greater-hazard defense" to the failure to install guardrails around the floor opening on level P–2. Employers seeking to establish such a defense must prove "(1) the hazards of compliance with [the] standard are greater than the hazards of noncompliance, (2) alternative means of protection are unavailable, and (3) a variance [ (a procedure by which an employer formally requests an exception from OSHA regulations) ] was unavailable or inappropriate." *Dole v. Williams Enters.,* 876 F.2d 186, 188 (D.C.Cir.1989). According

to McNulty, workers erecting guardrails around this particular floor opening would have been exposed to dangers from the potential collapse of an unsecured twenty-five-ton vertical wall member. As the Secretary correctly points out, McNulty mislabels this argument an infeasibility defense. Even properly labeled, however, the defense fails. McNulty points to no record evidence disputing the Commission's finding that even if installation of guardrails might have been hazardous, "McNulty could have installed perimeter protection *before* bringing the elevated wall piece up to the floor for installation." *A.J. McNulty*, 19 O.S.H. Cas. (BNA) at 1133 (emphasis addded). According to McNulty, this Commission finding "ignores [other] unrebutted testimony" by the company's chief compliance officer that installation of such guardrails was infeasible because "employees would have had to walk on a dangerously narrow flange to erect the guarding." Pet'r's Opening Br. at 39. But that testimony addressed only the feasibility of *bolted-stanchion* guardrails; the Commission's decision rests on its finding that the company could have used *free-standing* guardrails that can be quickly installed and removed, and—as photographs in the record indicate—would not have required workers to walk on the flange.

■ The other regulation involved in this category of citations requires that "[e]very open-sided floor ... 6 feet or more above adjacent floor or ground level ... be guarded by a standard railing." 29 C.F.R. § 1926.500(d)(1) (1994). These citations stem from the compliance officer's observation that McNulty, having yet to install walls on levels P–2 (both north and east sides), P–4, and P–5, had failed to erect guardrails around the exposed edges of those floors.

Conceding it erected no guardrails on the north side of level P–2, McNulty claims that the Commission should have excused the failure because the violation occurred within the "reasonable time" it was entitled to wait before installing guardrails. Pet'r's Opening Br. at 36. We disagree. Not only does the OSHA compliance officer's testimony suggest that McNulty could have installed temporary free-standing guardrails before beginning work in the area, *see supra*, but the Act nowhere grants employers an undefined "reasonable time" in which to bring workplaces into compliance. In fact, we have expressly held that employers must install OSHA-required fall protection *before* exposing employees to risk. *See, e.g., Am. Bridge/Lashcon v. Reich*, 70 F.3d 131, 134 (D.C.Cir.1995). Section 9(a) of the Act, also relied on by McNulty, is entirely inapplicable, for it governs the Secretary's authority to establish a reasonable "abatement period" within which an employer, once cited, may correct the violation in accordance with OSHA regulations. 29 U.S.C. § 659(a).

As to the east side of level P–2, McNulty offers a greater-hazard defense, again claiming that erecting guardrails would have subjected workers to the possible collapse of the twenty-five-ton vertical wall member. But as indicated above, substantial evidence supports the Commission's finding that the company could have erected free-standing guardrails *before* installing the wall member. *See supra* at 335.

With respect to the citations for the open-sided edges on levels P–4 and P–5, McNulty offers a greater-hazard defense (also mislabeled an infeasibility defense). But because McNulty never raised this objection either in its PDR or its Commission brief, the company has waived the opportunity to assert it here.

*Open-Sided Platforms*

This group of citations relates to McNulty's failure to provide fall protection for

employees working on several narrow, open-sided platforms, known as "picks" or "planks," ranging in width from twenty inches to two feet. OSHA regulations require that platforms located "6 feet or more above adjacent floor or ground level ... be guarded by a standard railing." 29 C.F.R. § 1926.500(d)(1) (1994). After a compliance officer observed several instances where McNulty used picks without guardrails, OSHA issued three citations. McNulty challenges only one: the citation for its failure to install rails on a pick spanning an "exhaust shaftway" on level P-2.

■ The company first argues that the platform regulations are inapplicable for two reasons: picks are temporary, whereas the regulation applies only to "surfaces that are part of a structure," Pet'r's Opening Br. at 40, and picks are not platforms at all, but rather scaffolds subject to OSHA regulations that prescribe specific safety standards for scaffolds, see generally 29 C.F.R. § 1926.451 (1994) (establishing safety requirements for scaffolds). The first contention is without merit. As the Commission persuasively points out, not only does the regulation expressly cover "temporary ... conditions," id. § 1926.500(a), but controlling circuit and Commission precedent makes clear that the regulation applies to temporary, narrow platforms such as the one at issue here, see Donovan v. Williams Enters., 744 F.2d 170, 176 (D.C.Cir.1984) (noting that guardrail regulations apply to temporary platforms); Armstrong Steel Erection, Inc., 17 O.S.H. Cas. (BNA) 1385, 1388–89 (O.S.H.R.C.1995) (stating that temporary planks constitute "runway" requiring guardrails).

■ Responding to McNulty's second argument—that picks are scaffolds, not platforms—the Secretary argues that section 660(a) deprives us of jurisdiction to consider the objection because the company failed to raise it before the Commission. Insisting that it did, McNulty argues that the issue "is identical to the reasoning" in cases cited in its Commission brief. Pet'r's Opening Br. at 40. This argument is doubly flawed. First, merely citing a case falls well short of "put[ting] the Commission on notice of the nature of or basis for [a] challenge," Durez, 906 F.2d at 5, particularly where, as here, McNulty cited the case for the unrelated proposition that the guardrail regulation does not govern temporary structures. As the Seventh Circuit explained, "simply citing a case below in one context and then, on appeal, arguing that the same case stands for something else does not preserve an argument." Modern Drop Forge Co. v. Sec'y of Labor, 683 F.2d 1105, 1115 n. 19 (7th Cir.1982). Second, the primary case on which McNulty now relies, Bethlehem Steel, 106 Md.App. 243, 664 A.2d 411, 17 O.S.H. Cas. (BNA) at 1388–89, appears neither in its PDR nor Commission brief.

McNulty also presents an infeasibility defense to this citation, arguing in excruciating detail that it could not have placed guardrails on a pick as narrow as the one at issue here. As the Commission points out, however, "an employer claiming that a platform was too narrow for guardrails must establish that it could not have substituted a wider one." A.J. McNulty, 19 O.S.H. Cas. (BNA) at 1133. The record, moreover, supports the Commission's finding that "[n]one of McNulty's witnesses testified that a wider platform could not have been substituted for the narrow one being used." Id. Put another way by the Secretary, even if installing guardrails on picks was infeasible, "McNulty had no right to use its equipment as it found it." Resp't's Br. at 53–54 (internal quotation marks omitted). See also Cleveland Consol., Inc. v. Occupational Safety & Health Review Comm'n, 649 F.2d at 1160, 1166 n. 11 ("An employer has a duty to plan a

method of construction that enables him to comply with OSHA regulations if possible.").

### Man-Basket

■ The "man-basket" at issue here was "a cage with horizontal rungs down which the employee would climb to reach and stand to bolt precast pieces together. The device was hung on a concrete wall." Pet'r's Opening Br. at 47. After a compliance officer observed a McNulty employee "accessing[,] egressing, and working from" a man-basket without securing himself with a safety belt, OSHA cited the company for two violations of a regulation requiring that "when workplaces are more than 25 feet above the ground," "[s]afety nets shall be provided ... where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical." 29 C.F.R. § 1926.105(a) (1994). The Commission affirmed these violations, though it reduced their severity from "willful" to "serious."

Challenging both citations, McNulty argues that it complied with the regulation because a man-basket *is* a scaffold within the meaning of the regulation, and that the scaffold (i.e., man-basket) provided the required fall protection. Despite the Secretary's suggestion to the contrary, McNulty preserved this objection by raising it in its Commission brief (though the Commission chose not to entertain the claim). Moreover, the first element of the company's argument—that a man-basket is a scaffold—finds some support in both the record and OSHA regulations, *see* 29 C.F.R. § 1926.450(b) (2001) (defining "scaffold" as "any temporary elevated platform (supported or suspended) and its supporting structure (including points of anchorage), used for supporting employees or materials or both"). Even if a man-basket is a scaffold, however, the citation remains valid. Pointing out that a man-basket provides no protection to workers *entering* and *exiting* the basket, the Secretary interprets the regulation to require such workers to use one of the listed alternative means of protection, such as safety belts, during these brief but precarious moments. This interpretation comports with decisions holding that the safety-net regulation "requires protection against each discrete fall hazard, even if of short duration." *Am. Bridge/Lashcon,* 70 F.3d at 134; *cf. Manganas Painting Co. v. Sec'y of Labor,* 273 F.3d 1131, 1134 (D.C.Cir.2001) (upholding Secretary's interpretation of safety net regulation to require *effective* fall protection as "reasonable ... indeed, ... obvious"). McNulty argues that as interpreted by the Secretary, the regulation requires redundant forms of protection: *"both* safety belts *and* a ladder or scaffold." Pet'r's Opening Br. at 49. This mischaracterizes the Secretary's position. She requires workers to use safety belts not while working *in* a man-basket, but only while entering or exiting it.

### III.

Having sustained the Commission's affirmance of the ten citations, we turn to McNulty's claim that the Commission erred in affirming as willful the Company's failure to comply with the two guardrail regulations. "Although the Act does not define the term 'willful,' courts have unanimously held that a willful violation of the Act constitutes 'an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements.'" *Ensign–Bickford Co. v. Occupational Safety & Health Review Comm'n,* 717 F.2d 1419, 1422 (D.C.Cir.1983) (quoting *Cedar Constr. Co. v. Occupational Safety & Health Review Comm'n,* 587 F.2d 1303, 1305 (D.C.Cir.1978)). According to McNulty, the Commission may find willfulness only where the employer exhibits reckless disregard. All circuits that have considered the issue, including this one,

however, have long accepted "intentional disregard or plain indifference" as the appropriate standard for willfulness within the Act's meaning. *See Ensign–Bickford,* 717 F.2d at 1422 (citing nine circuit court cases embracing the "intentional disregard or plain indifference" standard). McNulty points out that in *McLaughlin v. Richland Shoe,* the Supreme Court interpreted the term "willful" to require "reckless disregard." 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). Not only did the company waive this argument by failing to raise it before the Commission, but *McLaughlin* involves a different statute: the Fair Labor Standards Act.

▮▮▮▮ Disputing neither its awareness of the guardrail regulations nor its failure to comply with them, McNulty claims it believed in good faith that it had successfully established an infeasibility defense to each violation. "[A] good faith, reasonable belief by an employer that its conduct conformed to the law negates a finding of willfulness." *Sec'y of Labor v. Keco Indus.,* 1987 WL 89096, *11 (O.S.H.R.C. March 27, 1987); *see also McLaughlin v. Union Oil Co. of Cal.,* 869 F.2d 1039, 1047 (7th Cir.1989) ("A violation is not willful when it is based on a nonfrivolous interpretation of OSHA's regulations."). Because good faith is a question of fact, *see, e.g., R.R. Comm'n of Tex. v. United States,* 765 F.2d 221, 229 (D.C.Cir. 1985), the issue for us is whether the record supports the Commission's conclusion that McNulty did not possess a good-faith belief that it had established a legally sufficient infeasibility defense to the guardrail violations.

With respect to McNulty's failure to erect guardrails on open-sided platforms (picks), the Commission's observation that the record contains "scant evidence of good faith," *A.J. McNulty,* 19 O.S.H. Cas. (BNA) at 1140, seems generous. Ample record evidence, including McNulty's own rule requiring guardrails in areas of active construction, demonstrates the company's heightened awareness of the need for fall protection on these structures. Moreover, McNulty points to no evidence that it believed guardrails on these particular platforms to be infeasible; on the contrary, the record supports the Commission's conclusion that the company never "studied the situation in advance and determined that guardrails would be a problem." *Id.* Finally, the record supports the Commission's conclusion that McNulty never "made a good-faith evaluation of the facts and actually found that the platforms could not be wider." *Id.*

▮▮▮ Whether the Commission erred in affirming as willful McNulty's failure to erect guardrails around floor openings and open-sided edges presents a closer question, but we affirm this conclusion as well. In support of its determination, the Commission cited several pieces of record evidence, including Whiting–Turner's safety notices regarding McNulty's failure to install fall protection, McNulty's own safety standards requiring guardrails, and most persuasively, two "settlements" of the company's prior violations of the same fall-protection regulations at issue here. *Id.* at 1139. As we have held, prior citations for identical or similar violations may sustain a violation's classification as willful. *See, e.g., Cedar Constr.,* 587 F.2d at 1305. According to McNulty, OSHA issued these prior citations under entirely different circumstances (steel rather than precast concrete construction), but because this point appears for the first time in the company's reply brief, we will not consider it. *McBride v. Merrell Dow and Pharms., Inc.,* 800 F.2d 1208, 1211 (D.C.Cir.1986) ("Considering an argument advanced for the first time in a reply brief ... is not only unfair to an appellee but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (internal citations omitted)).

Finally, McNulty contends that the Commission acted arbitrarily and capriciously by failing to take account of the company's reliance on various ALJ decisions that, according to McNulty, gave rise to an objectively reasonable belief that it need not comply with the guardrail regulations. Although McNulty is right that the Commission failed to address the company's reliance on these decisions, that failure does not justify setting the decision aside, for we think the result would have been the same even if the Commission had considered the issue. *See Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n,* 194 F.3d 72, 79 (D.C.Cir.1999) ("[R]eversal and remand is 'necessary only when the reviewing court concludes that there is a significant chance that but for the error the agency might have reached a different result.'" (quoting Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 DUKE L.J. 199, 211)). Of the various ALJ decisions on which McNulty claims to have relied, only *Spancrete* can plausibly be read to create any exception to the guardrail regulations. Even generously construed, however, *Spancrete* stands only for the proposition that guardrails are not required at edges actively under construction. *See Spancrete,* 1981 WL 19242 at *3. So even if McNulty did rely in good faith on the purported *Spancrete* exception, its reliance would not alter the Commission's decision in light of the substantial record evidence supporting the Commission's conclusion that McNulty lacked a good-faith belief that these edges were actively under construction.

The petition for review is denied.

*So ordered.*