**KPMG, LLP, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 01–1131.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 15, 2002.

Decided May 14, 2002.

Rehearing and Rehearing En Banc Denied July 16, 2002.

Michael P. Carroll argued the cause for petitioner. With him on the brief were Ronald S. Flagg and Joseph R. Guerra.

Louis A. Craco, Jr. argued the cause and filed the brief for amicus curiae Amer-

ican Institute of Certified Public Accountants in support of petitioner.

Rada Lynn Potts, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were David M. Becker, General Counsel, Jacob H. Stillman, Solicitor, and Michael A. Conley, Attorney.

Before: HENDERSON, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge RANDOLPH.

ROGERS, Circuit Judge:

KPMG, LLP (formerly KPMG Peat Markwick, LLP) challenges a cease-and-desist order entered by the Securities and Exchange Commission, pursuant to Section 21C(a) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78u–3(a), on the basis of several violations of the securities laws and regulations. KPMG principally contends that the Commission lacks authority to turn the ancillary authority provided by Section 21C into an independent basis to sanction accountants, failed to give fair notice of its novel interpretation of Rule 302 of the Code of Professional Conduct of the American Institute of Certified Public Accountants ("AICPA"), and adopted an improper presumption in concluding there was a sufficient risk of future violations warranting a cease-and-desist remedy. KPMG also contends that the cease-and-desist order is overbroad and vague. We hold that although KPMG did not have fair notice of the Commission's interpretation of AICPA Rule 302, the Commission properly could use a negligence standard to enforce violations of the Exchange Act and Commission rules under Section 21C. We also hold that several contentions are waived, not having been raised before the Commission. We further hold that, although the Commission's explanation on reconsideration of the basis for its conclusion that there was a risk of future harm might leave ambiguous whether simply one or more than one of the violations would be sufficient to meet its standard for entry of a cease-and-desist order, there is no ambiguity here that the Commission on remand would reach the same result. Accordingly, we deny the petition for review.

I.

The Commission issued the cease-and-desist order following an evidentiary hearing that commenced, based on allegations by the Division of Enforcement and the Office of the Chief Accountant (together, "the Division"), with the issuance on December 4, 1997, of an order instituting a proceeding ("OIP") under Commission Rule of Practice 102(e) and Section 21C of the Exchange Act. The evidentiary hearing was to determine if KPMG had engaged in improper professional conduct violated Rule 2–02 of Regulation S–X and caused violations of Section 13(a) of the Act and Rule 13a–1 thereunder, and if so, what remedial actions or sanctions would be appropriate. The evidence at the hearing revealed the following:

In January 1995, as part of an effort to start a separate entity that would provide financial and business consulting services to clients, KPMG (then known as KPMG Peat Marwick) entered into a license agreement with KPMG BayMark, LLC ("BayMark"), and BayMark subsidiaries known as KPMG BayMark Strategies ("Strategies"), and KPMG BayMark Capital. Under its license agreement, KPMG agreed to lend $100,000 to each of the four founding principals to be used by them as equity contributions to BayMark and its

subsidiaries. Also under the agreement, KPMG granted BayMark rights to use "KPMG" as part of its name in return for a royalty fee of five percent of its quarterly consolidated fee income.

Glenn Perry, a senior partner in KPMG's Department of Professional Practice ("DPP") had previously met with Commission staff from the Office of the Chief Accountant ("OCA") to discuss independence issues surrounding the BayMark arrangement, and when OCA became aware that KPMG was moving forward with the plan, OCA staff asked KPMG for additional information. On October 19, 1995, Perry and a KPMG senior manager named Chris Trattou met with OCA staff. The meeting concluded with OCA staff cautioning KPMG against having BayMark provide services to any of the audit clients of KPMG. Notwithstanding this warning, on November 3, 1995, Strategies entered into an agreement with PORTA—a longstanding KPMG audit client facing financial difficulties—to provide "turnaround services" and assist it with financing. Leonard Sturm, KPMG's engagement partner for PORTA's 1994 audit, had introduced PORTA to BayMark. Under the agreement between PORTA and Strategies, one of BayMark's founding principals, Edward Olson, would be Chief Operating Officer of PORTA and Strategies would receive a management fee of $250,000 and a "success fee" based on a percentage of PORTA's earnings, disposed inventory, and restructured debt. On November 9, 1995, PORTA's Board of Directors elected Olson president and Chief Operating Officer of the company.

Sturm became aware that PORTA was engaging BayMark and contacted the DPP to determine whether it was okay for BayMark to provide services to an audit client. Trattou indicated that it was okay and that the Commission had no objection to it.

Once Sturm learned that Olson was an officer of PORTA, he inquired again as to whether there were any independence concerns with the audit. Trattou discussed the matter with Michael Conway, the partner in charge of the DPP; they disagreed as to the propriety of the arrangement, with Conway (and Perry) expressing concern.

After several meetings in December 1995 between Conway and Perry and OCA staff, OCA staff indicated that in order to resolve its independence concerns, KPMG would need to drop the KPMG initials from the BayMark parties' names, eliminate the royalty fee arrangement, and bring about the repayment of the $400,000 in loans made to the BayMark principals. Conway agreed to undertake negotiations with BayMark to make these changes. Although Conway alerted OCA staff to the existence of six dual engagements where KPMG was the auditor of record and BayMark had contracts with those clients, Conway did not inform OCA staff of the detailed entanglements involved with PORTA, i.e., the outstanding loan to Olson, Olson's status as an officer of PORTA and a principal of BayMark, and the success fee arrangement.

The evidence also showed that sometime before December 27, 1995, Trattou called Sturm with an answer to Sturm's earlier independence inquiries. Trattou indicated that the Commission was aware of the PORTA situation and that the KPMG audit of PORTA could proceed. On December 27, 1995, PORTA signed KPMG's engagement letter to conduct its 1995 audit. When OCA staff discovered the PORTA audit, it informed Conway that KPMG was not independent from PORTA because none of the structural changes to the BayMark strategic alliance had been implemented and a loan was outstanding to Olson who was part of PORTA's manage-

ment. By letter of June 21, 1996, OCA advised PORTA that KPMG's independence had been compromised and that PORTA's audited financial statements included in its 1995 annual report would be considered unaudited and not in compliance with federal securities laws.

In light of this evidence, an administrative law judge ("ALJ") found that under Generally Accepted Auditing Standards ("GAAS"), KPMG lacked independence from PORTA by virtue of its loan to Olson and that as a result, KPMG engaged in and caused violations charged in the OIP but did not engage in improper professional conduct under Rule 102(e) because KPMG did not act recklessly. *See Matter of KPMG Peat Marwick L.L.P.*, 71 S.E.C. Dkt. 1220, 2000 WL 45725, at *32–33 (Jan. 21, 2000). In determining a remedy, the ALJ considered the factors identified by the Commission as relevant to determining whether to issue an injunction: egregiousness of the defendant's action, isolated or recurrent nature of the infraction, degree of scienter involved, sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that his occupation will present opportunities for future violations. *See id.* at *34 (citing *Matter of Joseph J. Barbato*, 69 S.E.C. Dkt. 179, 200 n.31, 1999 WL 58922 (Feb. 10, 1999) (quoting *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir.1979), *aff'd on other grounds*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981))). The ALJ declined to issue a cease-and-desist order. The ALJ considered it significant that the audit itself was not challenged (and a second audit reached the same result), that the violations were not recurring, growing out of "highly unusual circumstances," and that there was no evidence of an adverse impact on investors. *See id.* at *34. The Division appealed the decision to the Commission.

The Commission conducted "an independent review of the record." *Order* at 3. It concluded, on the basis of KPMG's debtor/creditor relationship with Olson and its right to share in Strategies' "success" fee, that KPMG's independence was impaired under GAAS. Noting that KPMG admitted that the loan to Olson impaired its independence under GAAS, the Commission characterized the violation as a "serious" mistake that arose from KPMG's failure to exercise ordinary care to maintain its independence. Further, the Commission interpreted AICPA Rule 302 to "flatly prohibit[ ] an auditor from 'perfor[ming] for a contingent fee any professional services for, or receiv[ing] such a fee' from a client," and found that KPMG violated Rule 302 by receiving such a fee. The Commission concluded that "these relationships, whether considered individually or collectively, impaired [KPMG's] independence." *Order* at 32. Because of these impairments, the Commission concluded that KPMG violated Rule 2–02(b)(1) of Regulation S–X, 17 C.F.R. § 210.2–02(b)(1), which requires that the accountant's report "state whether the audit was made in accordance with generally accepted auditing standards." In addition, the Commission concluded that PORTA violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rule 13a–1, 17 C.F.R. § 240.13a–1, which requires issuers to file reports certified by independent public accountants. The Commission repeated that each of the two impairments (the debtor/creditor relationship and the contingency fee arrangement) "considered on its own, compromised [KPMG's] independence and each is sufficient, on its own, to support our finding of violations of Section 13(a) and Rule 13a–1," *Order* at 36, and "[s]imilarly, each impairment is sufficient, standing alone, to compromise independence under GAAS and to support our

finding of violation of Rule2–02(b)(1)." *Order* at 36.

Turning to the question of the appropriate sanctions for the violations, the Commission concluded that under Section 21C it could issue a cease-and-desist order for negligent conduct that causes a primary violation of the securities laws and regulations, and that KPMG had acted negligently in determining that it was independent from PORTA. As a result, the Commission issued a cease-and-desist order to KPMG because it acted negligently, which resulted in its primary violation of Rule 2–02(b) of Regulation S–X, and in its being a cause of PORTA's violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rule 13a–1, 17 C.F.R. § 240.13a–1. The Commission denied KPMG's motion for reconsideration and KPMG appealed to the court.

In Part II, we address KPMG's challenges to the determinations underlying the Commission's decision to issue a cease-and-desist order. In Part III, we address KPMG's challenges to the cease-and-desist order.

## II.

KPMG contends that it lacked fair notice in two respects. First, it contends it lacked fair notice of the Commission's interpretation of AICPA Rule 302 prohibiting the receipt of contingent fees. Second, it contends that it lacked fair notice that it could be sanctioned based on the conduct of Leonard Sturm. KPMG also contends that negligence is an impermissible basis for a cease-and-desist order against accountants who cause a violation of securities laws or regulations. KPMG further contends that it was improper to impose a cease-and-desist order on it for causing a violation of Section 13(a) of the Exchange Act in the absence of such an order against the primary violator, PORTA, and that it

cannot be sanctioned as a primary violator of the securities laws under Rule 2–02(b) of Regulation S–X because that provision imposes enforceable duties only on registrants, not accountants.

## A.

AICPA Rule 302 provides, in relevant part:

**Rule 302—Contingent fees.** A member in public practice shall not

(1) Perform for a contingent fee any professional services for, or receive such a fee from a client for whom the member or the member's firm performs,

(a) an audit or review of a financial statement;

. . . .

The prohibition in (1) above applies during the period in which the member or the member's firm is engaged to perform any of the services listed above and the period covered by any historical financial statements involved in any such listed services.

Except as stated in the next sentence, a contingent fee is a fee established for the performance of any service pursuant to an arrangement in which no fee will be charged unless a specified finding or result is attained, or in which the amount of the fee is otherwise dependent upon the finding or result of such service.

American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct Rule 302. The Commission found that KPMG's "success" fee arrangement with BayMark put it in a position to receive contingent fees in violation of the rule. *See Order* at 30. This determination that the conglomeration of fee arrangements at issue somehow constituted, in their totality, a contingent fee arrangement in favor of KPMG runs afoul of any

interpretation the AICPA or the Commission has ever attached to Rule 302.

Amicus AICPA points out that the Commission has recognized that AICPA's interpretation of its rules is generally authoritative, *see Opinion* at 26 & n.67, and yet disregarded AICPA's interpretation and applied Rule 302 incorrectly. AICPA states that as defined, the term "contingency fee" does not reach either the "success" fee PORTA paid BayMark or the royalty arrangement between BayMark and KPMG, standing alone. This is because BayMark was not an accounting firm, and thus not a "member in public practice," and because the royalty BayMark was committed to pay KPMG was not linked to the attainment of any "specified finding or result" and its amount was not "dependent upon the finding or result" of any professional or other service. By lumping the two separate compensation arrangements together, neither of which violates AICPA Rule 302, amicus concludes that the Commission "morph[s] the Rule into something entirely different than [AICPA] intended to promulgate." Amicus Brief at 5.

The plain language of Rule 302 does not forbid, as amicus puts it, " 'sets of relationships' but rather the performance of services for, or the receipt of, fees the existence or amount of which are contingent on particular 'findings' or 'results' of those services—in this case, the audit—not simply on the 'financial success of an audit client.' " *Id.* at 5–6. In other words, the rule on its face does not cover all services provided to PORTA, only professional services. Or at least that is the way Rule 302 was understood prior to the Commission's order in the instant case, according to the testimony of two expert witnesses presented by KPMG. The Commission declined to find that KPMG controlled BayMark. KPMG, then, received only a flat fee from

PORTA and did not "perform any professional services" for BayMark; rather, the supposed contingent fee here was not received from a client but was a royalty fee to be paid by a nonclient, BayMark. The Commission does not suggest in its brief to the court that the Commission has previously interpreted AICPA Rule 302 in a manner that would reach BayMark's "success" fee or KPMG's royalty fee. Indeed, its own accounting expert did not testify that Rule 302 was to be read the way the Commission did. Nor is there anything to suggest that Congress intended the Commission to fill in gaps left by AICPA; it would be another thing if the Commission had its own rule on contingent fees, but all it has is its general requirement that accountants be independent.

■ Even assuming that the text of AICPA Rule 302 is reasonably susceptible to the Commission's interpretation, as prohibiting KPMG from receiving an income stream while it was auditing PORTA's financial statements that was dependent in part on the size of PORTA's earnings, because that interpretation is novel and involves a strained reading of the rule, KPMG cannot be said to have had fair notice that the "success" fee/royalty arrangement would be deemed a prohibited contingent fee under AICPA Rule 302. *Cf. Checkosky v. SEC,* 23 F.3d 452, 460–61 (D.C.Cir.1994) (separate opinion of Judge Silberman). Even when the Commission's own rules are involved, although the Commission may broadly construe its rules, and because it cannot foresee every possible evasion of its rules, it may determine specific applications of its rules on a case by case basis, the court "cannot defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation." *Upton v. SEC,* 75 F.3d 92, 98 (2d Cir.1996) (citations omit-

ted). Given that this due process principle applies when the rule carries only civil penalties, *see id.* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982)), we hold that the Commission erred in finding that KPMG had violated AICPA Rule 302 as a result of its arrangement with BayMark and BayMark's arrangement with PORTA.

## B.

Regarding Leonard Sturm, KPMG also contends that it lacked fair notice it could be sanctioned based on his conduct. Specifically, KPMG contends that because Commission staff never challenged the propriety of Sturm's conduct throughout the administrative proceedings, for the Commission to predicate its cease-and-desist order in part on Sturm's conduct violated administrative due process and KPMG's right to fair notice. Amicus AICPA protests the Commission's conclusion that Sturm was negligent simply for relying on the DPP's opinion and proceeding with the PORTA audit. The Commission maintains, however, that because KPMG failed to raise this issue before the Commission it is not properly before the court.

 Section 25(c)(1) of the Exchange Act provides that "[n]o objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1). The purpose of Section 25(c)(1) is to "assur[e] that the Commission have had a chance to address claims before being challenged on them in court." *Blount v. SEC*, 61 F.3d 938, 940 (D.C.Cir.1995). Such statutory provisions are jurisdictional and serve as a bar to consideration by the court of issues not previously raised to the agency. *See Sims*

*v. Apfel*, 530 U.S. 103, 107–08, 120 S.Ct. 2080, 2083–84, 147 L.Ed.2d 80 (2000). However, the court has recognized that statutes containing the language of Section 25(c)(1), "or reasonable ground for failure to do so", include a safety valve. *See Marine Mammal Conservancy v. Dep't of Agriculture*, 134 F.3d 409, 412 (D.C.Cir. 1998) (citing as examples 15 U.S.C. § 78y(c)(1) ("reasonable ground for failure to do so"); 29 U.S.C. § 160(e) ("extraordinary circumstances")). *See generally Hormel v. Helvering*, 312 U.S. 552, 556–59, 61 S.Ct. 719, 721–23, 85 L.Ed. 1037 (1941). If KPMG failed to raise the issue of Sturm's negligence before the Commission, the question then becomes whether KPMG has provided a reasonable explanation for its failure to challenge the Commission's reliance on Sturm's conduct in issuing the cease-and-desist order.

It is clear that the negligence finding based on Sturm's conduct as audit partner is erroneous given the way the case was tried. The OCA did not challenge Sturm's conduct, and commented that Sturm was a "careful guy" who had been "kept in the dark." The ALJ concluded that Sturm had acted in good faith and believed that OCA staff "would not object to finishing the engagements underway." *Matter of KPMG*, 71 S.E.C. Dkt. 1220, 2000 WL 45725, at *32. Nonetheless, the Commission criticized KPMG for failing to recognize the seriousness of its actions or inaction citing Sturm's conduct as one example. *See Reconsideration Order* at 11. In light of the absence of an OCA challenge to Sturm's conduct either in its OIP or in response to the ALJ's decision, KPMG's first notice that Sturm's conduct would be considered negligent came when the Commission issued its *Order*. *See Order* at 43. Nonetheless, in seeking reconsideration by the Commission, KPMG failed to challenge the Commission's find-

ing as to Sturm. KPMG explains, however, that it was not until the *Reconsideration Order* "that it became other than pointless to raise [the issue]."

■ In its original opinion the Commission stated that each of the violations it found independently justified its cease-and-desist order. *See Order* at 54. Given this, and the fact that the Commission found Conway, the head of DPP, to be negligent as well, it might have been "clearly useless" for KPMG to object to a sanction for Sturm's conduct. *See Randolph–Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 105–06 (D.C.Cir.1986). The question is not without difficulty, however. *See id.* Safety valves are subject to abuse, *see, e.g., Etelson v. Office of Personnel Management,* 684 F.2d 918, 925 (D.C.Cir.1982), and a mere losing position—in the absence of circumstances such as an agency position that it is without jurisdiction to act or a very clearly articulated agency position, such as refusing to change a rule absent judicial instruction to do so—is insufficient. *See Randolph–Sheppard,* 795 F.2d at 105; *cf. Marine Mammal Conservancy,* 134 F.3d at 413. The Commission plausibly maintains on appeal both that a single violation of the type at issue here can suffice for issuance of a cease-and-desist order and that the finding that Sturm was negligent was not essential. Our decision leaves in place the Commission's negligence findings on a number of statutory and rules violations by KPMG. For these reasons, we need not decide whether KPMG's explanation brings it within Section 25(c)(1)'s safety valve. The rationale underlying exhaustion requirements is sufficiently important that it behooves the court to avoid possibly expanding the "futility" exception when it is unnecessary to do so. *See Randolph–Sheppard,* 795 F.2d at 104–05; *see also McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d

194 (1969); 3 R.J. Pierce, Administrative Law Treatise, § 15.2 at 970, 974 (2002).

## C.

■ KPMG also challenges the propriety of a negligence standard under Section 21C. In contesting the Commission's position that this issue is not properly before the court because it was not raised "at any point in these proceedings," Respondent's Br. at 35, KPMG responds that because the Commission has previously disclaimed authority to regulate accountants other than pursuant to Rule 102(e) (and its predecessors), and the prosecution proceeded on that basis, its challenge to a negligence standard for Rule 102(e) is properly understood as a challenge to a negligence standard however the Commission might seek to regulate accountants. That may be somewhat of a stretch. But, in its brief before the Commission, KPMG argued that the Division was seeking to impose strict liability under Rule 21C for independence violations and that such constituted "an unwarranted *de facto* expansion of the Division's powers to sanction professionals." KPMG noted that under this approach, Rule 102(e)—at issue in *Checkosky v. SEC,* 23 F.3d 452, 455 (D.C.Cir.1994)— would never need to be invoked and any violation of the rules would justify a cease-and-desist order. This was *sufficient to* alert the Commission to the challenge to its authority to enter a cease-and-desist order on the basis of a negligence standard. *See Blount v. SEC,* 61 F.3d 938, 940 (D.C.Cir.1995); *Dep't of Treasury v. FLRA,* 762 F.2d 1119, 1122 (D.C.Cir.1985). The Commission, in fact, was alerted to the issue, ruling that negligence is sufficient to establish liability under Section 21C, and specifically rejecting KPMG's due process claim based on its reading of the court's holding in *Checkosky. See Order* at 38–39 & n.99.

On the merits, KPMG's contention that the Commission cannot use Section 21C "to bootstrap" its authority to regulate accountants fails on several grounds. First, Rule 102(e) provides that the Commission may sanction accountants in a particular manner. The rule provided at the time of the administrative proceeding that the Commission could "deny, temporarily or permanently, the privilege of appearing or practicing before it" to any accountant who had "engaged in unethical or improper professional conduct" or "willfully violated . . . any provision of the Federal securities laws." 17 C.F.R. § 201.102(e)(1996). No such barring order was entered here, and there is nothing in the rule itself to indicate that it is the exclusive means for addressing accountants' conduct. KPMG's contention · that the Commission viewed Rule 102(e) to be the exclusive basis for disciplinary actions against accountants is an overstatement: In *Touche Ross & Co. v. SEC*, 609 · F.2d 570 (2d Cir.1979), on which KPMG relies, the court made no more than a historical statement that the rule was "the basis for a number of disciplinary proceedings" in rejecting a challenge to the Commission's authority to discipline accountants and others. *Id.* at 578. Commission decisions cited by KPMG are not to the contrary. *See, e.g., Carter v. Johnson*, 47 S.E.C. 471, 1981 WL 314179 (1981). Nor is the fact that in *Checkosky* the Commission declined to take a position on whether negligence was sufficient under Rule 102(e) dispositive, as KPMG appears to maintain; a Section 21C issue was simply not before the court.

Second, the premise of KPMG's view that the Commission's invocation of Section 21C is no more than a way to circumvent the scienter requirement of Rule 102(e) is flawed. There is no support for the position that the culpability standards governing Rule 102(e) proceedings can be applied with equal force in Section 21C proceedings. The nature of the two proceedings is different. As the Commission points out, "one is a professional disciplinary proceeding designed to protect the integrity of the Commission's process while the other is a law enforcement proceeding," each involving "fundamentally different remedies . . . ." Respondent's Br. at 46. *See Checkosky*, 23 F.3d at 456 (separate opinion of Judge Silberman); *id.* at 467, 471 (separate opinion of Judge Randolph). KPMG's view that it was only by disclaiming jurisdiction to sanction accountants as primary violators of securities law that the Commission was able to justify Rule 102(e) as an administrative disciplinary rule impales on the same flawed premise. Likewise, KPMG's position that the federal court has exclusive jurisdiction over actions to punish violations of the securities laws under 15 U.S.C. § 78aa fails to distinguish between the Commission's authority to discipline professionals from its substantive enforcement functions. *See Checkosky*, 23 F.3d at 456 (separate opinion of Judge Silberman).

Third, the Commission found that KPMG violated the independence requirement of Rule 2–02(b)(1) of Regulation S–X. *See Order* at 36. KPMG acknowledges that the Commission has used the independence requirement as a "baseline for assessing the propriety of an accountant's conduct under its rules of practice." Petitioner's Br. at 26. In other words, the Commission has interpreted the independence requirements of Regulation S–X to apply to accountants. The very cases KPMG cites include *Matter of Alan S. Goldstein, et al.* 57 S.E.C. Dkt. 1419 & 1421, 1994 WL 499304 & 1994 WL 499312 (Sept. 6, 1994), where the Commission both censured an accountant under the predecessor to Rule 102(e) and enjoined the accountant under Section 21C from

causing violations of Section 17(a)(1) and Rule 18a–5(d) by virtue of lack of independence. KPMG's implicit argument that imposition of discipline is a necessary precondition to enforcement under Section 21C finds no support in the authorities on which it relies.

Moreover, the Commission was virtually compelled by Congress' choice of language in enacting Section 21C to interpret the phrase "an act or omission the person *knew or should have known* would contribute to such violation" as setting a negligence standard. *See Order* at 38. KPMG contends that the court should give no deference to the Commission's interpretation of Section 21C as regulating accounting negligence as it is an unexplained and unsupportable usurpation of authority. Yet the plain language of Section 21C invokes, as the Commission stated, "classic negligence language." *Order* at 38 (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642, 119 S.Ct. 1661, 1670–71, 143 L.Ed.2d 839 (1999); *United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir.2000)). To the extent that KPMG sought reconsideration by the Commission on the ground that the Commission sanctioned it for negligent conduct based on an evidentiary hearing held under a scienter standard, we see no occasion to elaborate on the Commission's reasoning. *See Reconsideration Order* at 3–10. In denying reconsideration, the Commission pointed to the administrative record where the ALJ had ruled that only the misconduct charged under Rule 102(e) would be governed by a scienter standard. The Commission also noted that the Division had made clear that it would premise its litigation of the charges under Section 21C on a negligence standard. KPMG has no response.

### D.

■ KPMG further contends that it was improper to impose a cease-and-desist order on it for causing a violation of Section 13(a) in the absence of such an order against the primary violator, PORTA, and that it cannot be sanctioned as a primary violator of the securities laws under Rule 2–02(b) of Regulation S–X because that provision imposes enforceable duties only on registrants, not accountants. Review of the record before the court reveals that KPMG failed to press these objections before the Commission. Consequently, the court lacks jurisdiction to address them.

The record does not show that any of KPMG's legal briefs before the ALJ or the Commission addressed or mentioned the issue of the Commission's authority to issue a cease-and-desist order against causing or secondary violators without sanctioning primary violators. The Commission's brief to this court makes this point, and KPMG did not contest the point in its reply brief. Because the Commission has not had an opportunity to address KPMG's primary violator contention, it is not properly before the court.

■ The record further indicates that KPMG effectively abandoned any contention that Regulation S–X does not apply directly to accountants. KPMG mentioned the argument in its post-trial legal brief to the ALJ when it stated, "In any event, Regulation S–X was promulgated to effectuate the registration requirements of Section 13(a), 15 U.S.C. § 78m(a), which, by its terms, applies to issuers of securities, not their auditors." KPMG made no attempt to elaborate on this comment and made no other mention of this point elsewhere in the proceedings. An argument cannot be merely intimated or hinted at to be raised; it must be "pressed" to be preserved. *Hays v. Sony Corp.*, 847 F.2d 412, 420 (7th Cir.1988); *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993); *see also In Re Espino*, 806 F.2d

1001, 1002 (11th Cir.1986). Because KPMG made no mention of this issue in its brief to the Commission or its motion for reconsideration, all indications are that the argument was either dropped or that it was not truly an argument that KPMG had ever pressed. Where a litigant "seem[s] to abandon its argument" the court will hold that "the agency did not have a fair opportunity to address this argument." *Busse Broadcasting Corp. v. FCC*, 87 F.3d 1456, 1461 (D.C.Cir.1996). Given Section 25(c)(1)'s purpose to afford the Commission the first opportunity to address claims, *see Blount*, 61 F.3d at 940, we cannot conclude that KPMG's passing reference to an issue that was later abandoned gave the Commission that opportunity.

### III.

KPMG challenges the cease-and-desist order as improper on a variety of grounds, only one of which we conclude has apparent merit. KPMG makes much of the fact that Congress referred to the cease-and-desist authority of other agencies, *see* S.Rep. No. 101–337, at 19; H.R.Rep. No. 101–616, at 23, in contending that Section 21C gave the Commission no new authority to regulate professional conduct. But KPMG cites no authority that other agencies had declined to issue cease-and-desist orders as part of their enforcement powers against a person who, although a professional, had been found to violate the relevant laws either directly or by causing another to violate the laws. In fact, the converse is true. *See, e.g., Matter of Phillip C. Zarcone*, CFTC Dkt. No. 93–18, 1993 WL 302633, at *1 (Aug. 10, 1993) (accountant); *Matter of California Dental Ass'n*, 1995 WL 452990 (July 17, 1995), *rev'd on other grounds, California Dental Ass'n. v. FTC*, 224 F.3d 942 (9th Cir.2000); *Matter of Superior Court Trial Lawyers Ass'n*, 107 F.T.C. 510 (June 23, 1986), *af-firmed on other grounds, Superior Court Trial Lawyers Ass'n v. FTC*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Moreover, KPMG does not dispute that under Section 21C the Commission may impose sanctions for such violations, and never argued to the Commission that it lacked authority to hold KPMG accountable for misrepresenting its independence in its Independent Auditor's Report.

 The Commission's cease-and-desist order required that KPMG cease and desist from committing present or future violations of Rule 2–02(b) of Regulation S–X, or being the cause of any present or future violation of Section 13(a) of the Exchange Act or Rule 13a–1 thereunder due to an act or omission that KPMG knows or should know will contribute to such violation, by having any transactions, interests or relationships that would impair its independence under Rule 2–01 of Regulation S–X or under GAAS. In addressing KPMG's challenges to the order, our review of the Commission's choice of a sanction is limited by both the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (2000), and Supreme Court precedent. *See Wonsover v. SEC*, 205 F.3d 408, 412 (D.C.Cir.2000). The APA limits our inquiry to whether the Commission's sanction was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Wonsover*, 205 F.3d at 413. The Supreme Court has long instructed that the Commission's choice of sanction shall not be disturbed by the court unless the sanction is either "unwarranted in law or is without justification in fact." *American Power & Light v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 145–46, 91 L.Ed. 103 (1946); *Wonsover*, 205 F.3d at 413 (citations omitted).

## A.

KPMG contends that the cease-and-desist order is overbroad because it bears no reasonable relation to the violations found. KPMG also contends that the order is unduly vague because by prohibiting all relationships that violate GAAS, the order incorporates broad, open-ended standards that require interpretation and exposes KPMG to the possibility of punishment for making good-faith but incorrect judgments about compliance. Neither contention is persuasive.

Section 21C authorizes the entry of a cease-and-desist order to prohibit "*any* future violation of the same provision" found to have been violated in the instant case. 15 U.S.C. § 78u–3 (emphasis added). The provisions at issue are Rule 2–02(b) of Regulation S–X, Section 13(a) of the Exchange Act, and Rule 13a–1 promulgated thereunder. There is, consequently, no "sweeping order to obey the law" as KPMG contends, because the terms of the order are limited to these provisions. Further, the Commission stated that the order "extends only to violative acts 'the threat of which in the future is indicated because of their similarity or relation to those [past] unlawful acts.'" *Order* at 47 n. 121. The order thus extends only to a subset of the violations comprehended by the rules and statutory provisions involved, namely those that are independence related. By concluding that the seriousness of KPMG's misconduct, combined with the flaws in its mode of assessing independence, created a serious risk of future independence-impairing relationships beyond the two circumstances at issue, *see Order* at 54, the Commission justified an order aimed at preventing violations flowing from a broader array of independence impairments than the precise ones found. In so doing, it cannot be said that the order has "no reasonable relation to the

unlawful practices found to exist." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394–95, 85 S.Ct. 1035, 1047–48, 13 L.Ed.2d 904 (1965). The order is unlike those condemned in the cases on which KPMG relies, such as *ITT Continental Baking Co. v. FTC*, 532 F.2d 207, 221 (2d Cir.1976), and *Joseph A. Kaplan & Sons, Inc. v. FTC*, 347 F.2d 785, 789–90 (D.C.Cir.1965), where the cease-and-desist orders extended beyond the nature of violations found. It also is unlike the orders in *NLRB v. Express Pub. Co.*, 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941), or *Swanee Paper Corp. v. FTC*, 291 F.2d 833, 838 (2d Cir.1961), which were not limited to related activities. *Chrysler Corp. v. FTC*, 561 F.2d 357 (D.C.Cir.1977), is distinguishable because in that case the Federal Trade Commission conceded that the marketing violations were "unintentional," "not continuing," and "confined to two out of fourteen advertisements," thus providing less justification for a more wide-ranging ban. *Id.* at 364. *Country Tweeds, Inc. v. FTC*, 326 F.2d 144 (2d Cir.1964), is similarly distinguishable given the voluntary cessation of the offending conduct long before the complaint was filed and the likelihood that the offending party would not resume such or related conduct. *Id.* at 149.

Neither is there any requirement on the part of the Commission to tailor its order more narrowly to specific types of violations of the provisions involved. The "any future violation" language in Section 21C makes this clear and the "reasonable relationship" requirement does not impose such a limit. As the Supreme Court observed in *FTC v. Ruberoid Co.* 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952), cease-and-desist authority is "not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envi-

sioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *Id.* at 473, 72 S.Ct. at 803. What KPMG would appear to suggest is required—namely an order so narrow that in the absence of copy-cat violations there would be no possibility of a violation of the order—ignores the expansive language used by Congress. Given the Congressional purpose of empowering the Commission "to curb a wider range of securities violations" in an effort to "combat recidivism," S.Rep. No. 101–337, at 1 (1990); *see* H. Rep. No. 101–616, at 23–24, the Commission could reasonably interpret Section 21C as empowering it to issue orders limited only by the specific provisions of law or regulations found to have been violated.

Consequently, the record belies KPMG's contentions that the order bears no reasonable relation to the violations found and was entered without regard to the nature of the infraction or the good-faith of the accountant involved. The judgment underlying the Commission's decision that the independence violations were of an order of seriousness that KPMG failed to appreciate is the type of agency expertise to which courts defer. *See Svalberg v. SEC,* 876 F.2d 181, 184 (D.C.Cir.1989); *see also Blinder, Robinson & Co. v. SEC,* 837 F.2d 1099, 1107 (D.C.Cir.1988).

█ KPMG's challenge to the cease-and-desist order on vagueness grounds is similarly without merit. KPMG contends that because GAAS standards are "vague and open-ended" the Commission could not properly enjoin compliance with broad prohibitions that require subjective interpretation and complex judgments over which reasonable professionals may disagree. This court has observed, in light of the severity of monetary penalties under antitrust laws, that cease-and-desist orders should be "sufficiently clear and precise to avoid raising serious questions as to their meaning and application." *Joseph A. Kaplan,* 347 F.2d at 790 (quoting *FTC v. Henry Broch & Co.,* 368 U.S. 360, 367–68, 82 S.Ct. 431, 435–36, 7 L.Ed.2d 353 (1962)). KPMG nevertheless fails to show that such serious questions will necessarily arise to its detriment.

Section 21C allows for the order to enjoin the "causing [of] such violation and any future violation of the same provision, rule, or regulation." That is all the order did; it ordered KPMG to "cease and desist from committing any violation or future violation of Rule 2–02(b) of Regulation S–X, or from being a cause of any violation or future violation of Section 13(a) of the Securities Exchange Act of 1934 or Rule 13a–1 thereunder." The order merely tracks the statutory language and inserts the relevant provisions. Further, although GAAS may be a complex scheme and reasonable professionals may differ as to its application to discrete sets of facts, it is not a set of indefinite and open-ended standards subject to the whims of the Commission. Rather, as with most provisions of the law, there are broad areas of clarity and instances closer to the line where there will be some doubt. *See generally Checkosky,* 23 F.3d at 472–73 & n. 7 (separate opinion of Judge Randolph); *cf. Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 100–01, 115 S.Ct. 1232, 1239–40, 131 L.Ed.2d 106 (1995). The rule, as amended, effective February 2001, Exchange Act Rel. No. 43602, 2000 WL 1726933, at *1, 73 S.E.C. Dkt. 1885 (Nov. 21, 2000), includes examples of when independence will be found lacking, and while non-exclusive, the examples nonetheless inform the general standard. *See id.* at *35. Although absolute precision is impos-

sible, even with an objective standard, *see Bristol–Myers Co. v. FTC*, 738 F.2d 554, 560 (2d Cir.1984), KPMG fails to show that it will have "difficulty applying the Commission's order to the vast majority of their contemplated future [actions]." *Colgate-Palmolive*, 380 U.S. at 394, 85 S.Ct. at 1047. But, as KPMG is aware, if a situation arises where KPMG is "sincerely unable to determine whether a proposed course of action would violate the present order, [KPMG] can ... oblige the Commission to give ... definitive advice as to whether [the] proposed action if pursued, would constitute compliance with the order." *Id.* If KPMG has a disagreement with the Commission as to its interpretation of a GAAS standard, it will have the opportunity to make the case for its interpretation in any contempt proceeding the Commission may institute to adjudicate an alleged violation of the order.

### B.

More problematic, however, is KPMG's contention that in entering the cease-and-desist order, the Commission created an improper presumption that a past violation is sufficient evidence of "some risk" of future violation, and applied it in an arbitrary and capricious manner whereby it is, "in essence, irrebuttable," ignoring KPMG's evidence of serious remediation and the ALJ's finding there was no future threat of harm. In seeking reconsideration by the Commission, KPMG argued that the Commission had failed to comply with the standard that it had established for issuance of a cease-and-desist order—namely some likelihood of future violation based on proof of some continuing or threatened conduct by KPMG creating an increased likelihood of future violations—and that there was no such evidence. The plain language of Section 21C, as well as the legislative history, *see* S.Rep. No. 101–337, at 18; H.R.Rep.

No. 101–616, at 24, undermine KPMG's contention that the Commission erred in proceeding on the basis of a lower risk of future violation than is required for an injunction. However, the precise manner in which the standard is met is unclear from the Commission's analysis on reconsideration.

In its original opinion, the Commission acknowledged that:

> in imposing sanctions, we traditionally have balanced a variety of mitigating and aggravating circumstances, such as the harm caused by the violations, the seriousness of the violations, the extent of the wrongdoer's unjust enrichment, and the wrongdoer's disciplinary record. The questions this case poses are whether, as a matter of either statutory command or in the exercise of our broad discretion, we will require some showing of likelihood of future violations before issuing a cease-and-desist order, and how that showing may be made.

*Order* at 46. The Commission had stated that a single violation sufficed to show the necessary likelihood. *See id.* at 54. On reconsideration, the Commission explained that, consistent with the history leading up to the enactment of Section 21C, it had applied a standard for showing a risk of future violations that was significantly less than that required for an injunction. *See Reconsideration Order* at 10. To the Commission, "although 'some risk' of future violations is necessary, it need not be very great to warrant issuing a cease-and-desist order and that in the ordinary case and absent evidence to the contrary, a finding of past violation raises a sufficient risk of future violation." *Id.* Disclaiming that issuance of a cease-and-desist order is "automatic" on a finding of past violation, the Commission stated that "[a]long with the risk of future violations, we will contin-

ue to consider our traditional factors in determining whether a cease-anddesist order is an appropriate sanction based on the entire record." *Id.*

The Commission proceeded to reject KPMG's argument that the violative conduct was isolated, inadvertent, and unconnected to any ongoing conduct or engagement. Rather, the Commission explained, that although "the isolated nature of the violations tended to counsel against relief.... we did not, and do not, consider the lack of care at senior levels that attended the independence determinations in this case to have been merely inadvertent or to be 'unconnected' to any ongoing conduct or engagement." *Id.* at 11. The risk of future violations arises here, the Commission explained, "from the manifestly inadequate level of scrutiny given to independence issues and [KPMG's] consistent failure to recognize the seriousness of this misconduct." *Id.* The Commission then noted that the loan to Olson, an officer of a registrant, was, in the words of a witness, "an absolute blatant out-and-out violation" of GAAS. *Id.* More specifically, the Commission stated:

> We found that this impairment, as well as the impairment flowing from [KPMG's] right to receive a fee contingent on the registrant's success [in violation of AICPA Rule 302], resulted in serious violations and that [KPMG] failed to appreciate that seriousness. We also determined that the violations flowed from the negligent failures of the head of [KPMG]'s DPP [Conway] and the audit partner [Sturm] to inform themselves about facts material to specific issues about independence attending [KPMG]'s audit engagement—when both had questions or concerns about the propriety of the audit and had ready access to relevant information. *These findings, as well as others* detailed in our opinion, are based on the record as a

whole and *are more than adequate to support our conclusion* that there was not just 'some' risk but a 'serious' risk of future violation, which, *together* with the traditional sanctioning factors we considered, fully warranted the cease-and-desist relief we issued. (Emphasis added)

*Id.* at 11.

The Commission's statement on reconsideration suggests that it may no longer consider, as it initially made clear, *see Order* at 54, that any one of its findings of a violation, standing alone, would suffice under its standard to enter a cease-and-desist order. At oral argument counsel for the Commission argued that the language in the *Reconsideration Order* is insufficiently precise to suggest that the Commission had changed its mind. In truth, the *Reconsideration Order* leaves this unclear. Nevertheless, in light of the Commission's having found several serious violations—all but one of which we affirm—we conclude that a remand is unnecessary. *See McNulty & Co. v. Sec'y of Labor,* 283 F.3d 328, 339 (D.C.Cir.2002).

The Commission stated in its original order that either the outstanding loan or the "success" fee/royalty arrangement, standing alone, compromised KPMG's independence and that "each of the violations we have found today independently calls for cease-and-desist relief." *Order* at 54. On reconsideration, the Commission continued to find multiple violations of sufficient seriousness to warrant cease-and-desist relief under either a "some-risk-of-future-violation" standard or a "serious-risk-of-future-violation" standard. *Reconsideration Order* at 11. Removing the Commission's erroneous finding that KPMG violated AICPA Rule 302 still leaves what was characterized as "an absolute blatant out-and-out violation" of GAAS in the form of the loan to Olson. *Order* at

30; *Reconsideration Order* at 11. Similarly, removing the alleged negligence of Sturm, who was perhaps the only "careful guy" involved in the "strategic alliance" between KPMG and BayMark, still leaves, at the very least, "the negligence of the head of [KPMG's] Department of Professional Practice," Conway, who, according to the Commission, rendered a "manifestly inadequate level of scrutiny ... to independence issues" when scrutiny was most needed. *Reconsideration Order* at 11. Under these circumstances, and consistent with remanding only when we conclude "that there is a significant chance that but for [an] error the agency might have reached a different result," *McNulty*, 283 F.3d at 339 (citing *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 79 (D.C.Cir.1999)), we conclude that "[i]t would be meaningless to remand." *NLRB v. Wyman–Gordon*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969).

## IV.

Accordingly, because KPMG lacked fair notice of the Commission's interpretation of AICPA Rule 302, we reverse the Commission's finding that the "success" fee/royalty arrangement violated that rule. As to KPMG's contention that it also lacked fair notice it could be sanctioned on the basis of Sturm's conduct, we conclude, in view of our disposition and the Commission's position on appeal, that we need not decide whether KPMG's failure to challenge the Commission's finding as to Sturm falls within the safety valve of Section 25(c)(1). We affirm the Commission's determination that negligence is an appropriate basis for violations underlying a Section 21C cease-and-desist order, and reject KPMG's contentions that the order is overbroad and vague. Because not raised before the Commission, we do not address KPMG's challenges to the Com-

mission's determinations that it may impose sanctions under Section 21C on secondary violators without also sanctioning primary violators, and that Regulation S–X may apply directly to accountants. Finally, we conclude that a remand to allow the Commission to clarify whether simply one or a combination of two or more of the violations it found suffice to meet its standard for finding a risk of future violation to enter a cease-and-desist order is unwarranted in light of the Commission's alternative findings of violations in its original order. We therefore deny KPMG's petition for review.

RANDOLPH, Circuit Judge, dissenting:

I believe the SEC's cease and desist order should be vacated and remanded to the agency.

In its first opinion, the SEC nodded in favor of the need to find some risk of future misconduct as a precondition to a cease and desist order. But it then turned around and held that "[a]bsent evidence to the contrary, a finding of violation raises a sufficient risk of future violation." KPMG challenged this conclusion, and on reconsideration the SEC expressly disclaimed any notion that a cease and desist order is "automatic" after a violation of the securities laws. The SEC said it will continue to consider "our traditional factors" before imposing a cease and desist order, which, according to the SEC's first opinion, appear to be "the harm caused by the violations" (here none), "the seriousness of the violations," "the extent of the wrongdoer's unjust enrichment" (here none), and "the wrongdoer's disciplinary record" (as acknowledged at oral argument, meager at best). In its opinion on reconsideration, the SEC wrote that its "findings"—(1) the loan to Olson; (2) the contingent fee arrangement; (3) KPMG's lack of remorse;

and (4) the negligence of the KPMG partners including Conway and Sturm, all of which it discussed in the prior sentences—were "more than adequate to support [the SEC's] conclusion that there was ... a serious risk of future violation, which, together with the traditional sanctioning factors we considered, fully warranted the cease-and-desist relief [the SEC] issued."

The SEC's contingent fee finding was clearly erroneous. On its face, AICPA's Rule 302 covers not all services provided to Porta Systems, but only professional services. RULES OF PROFESSIONAL CONDUCT § 302 (American Inst. of Certified Pub. Accountants 2001). The SEC's interpretation of the rule receives no deference because we have no hint that Congress intended the SEC to fill in gaps left by AICPA. It would be another thing entirely if the SEC had its own rule on contingent fees, but all the agency has is its general requirement that accountants be independent. *See* 17 C.F.R. § 210.2–01.

It is also clear that the SEC's negligence finding based on Sturm's conduct is erroneous given the way the case was tried. There was no charge of wrongdoing regarding Sturm. At trial before the Administrative Law Judge, the SEC enforcement staff called Sturm "a careful guy" who was "kept in the dark." As to KPMG's failure to bring this objection to the SEC, we do not require that a party raise arguments when it would be futile to do so. *See, e.g., Omnipoint Corp. v. FCC,* 78 F.3d 620, 635 (D.C.Cir.1996). The SEC's original opinion explicitly stated that each of its four reasons for issuing the order independently justified its cease and desist order. It was only on reconsideration that the SEC made an about-face and lumped all the findings together. Given this posture, and the fact that the SEC found Conway to be negligent as well, it would have been "clearly useless" for KPMG to object to imposition of a sanction for Sturm's conduct in its motion for reconsideration. *See Randolph–Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 105–06 (D.C.Cir.1986).

The reconsideration order criticizes KPMG for its "consistent failure to recognize the seriousness" of its violations. True, KPMG mounted a vigorous defense to the SEC's case, but those charged with misconduct have a right to defend themselves. Also, it is arbitrary for the SEC to fault KPMG for not recognizing the seriousness of Sturm's so-called misconduct when the SEC enforcement staff praised his behavior.

In light of the SEC's errors in finding a contingent fee arrangement and in finding Sturm negligent, the cease and desist order cannot be sustained. We should have vacated the order and sent the case back so the SEC could decide whether it still wants to issue the order without these legs of the table.

I would therefore not reach any of the other issues in the case.